01
02
03
04
05                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF CALIFORNIA

06  NIMA REZAEI,                        )
                                        )
07          Petitioner,                 )    CASE NO. 2:07-cv-02373-RSM-JLW
                                        )
08          v.                          )
                                        )
09  D.K. SISTO, Warden,                 )    REPORT AND RECOMMENDATION
                                        )
10          Respondent.                 )
    _____)

11

12      I.      INTRODUCTION

13          Petitioner is a California prisoner who is currently incarcerated at the California State

14  Prison - Solano, in Vacaville, California.  (*See* Docket 1 at 1.)  He was convicted by a jury of

15  attempted second degree murder and personal use of a firearm causing great bodily injury in

16  the Sacramento County Superior Court.  (*See* Dkt. 11 at 3; Dkt. 16, 2 Clerk's Transcript 342-

17  43.)  Petitioner was sentenced to prison for nine years for the attempted murder conviction,

18  and twenty-five-years-to-life for the firearm enhancement.  (*See* Dkt. 16, 2 CT 418.)  He has

19  filed a petition under 28 U.S.C. § 2254 seeking relief from his current confinement.  (*See* Dkt.

20  1.)  Respondent has filed an answer to the petition, together with relevant portions of the state

21  court record, and petitioner has filed a traverse in response to the answer.  (*See* Dkts. 11, 16,

22  and 22.)  The briefing is now complete and this matter is ripe for review.  The Court, having

REPORT AND RECOMMENDATION - 1

01 thoroughly reviewed the record and briefing of the parties, recommends that petitioner's

02 federal habeas petition be denied and this action dismissed with prejudice.

03     II.   FACTUAL AND PROCEDURAL HISTORY

04     Petitioner was charged with the June 19, 2000, attempted murder of the victim,

05 Delontae Martin, as described below.  His initial trial resulted in a deadlocked jury, and the

06 court declared a mistrial.  (*See* Dkt. 16, Lodged Document 1 at 2.)  Petitioner's second jury

07 trial began in February 2003.

08     On direct review, the California Court of Appeal summarized the relevant facts

09 adduced during petitioner's retrial as follows:

> The victim and defendant (who were 18 or 19 years old at the time of the shooting) knew each other socially. . . . On the night of the shooting, the victim was sitting outside his apartment near American River College, around 11:20 p.m.  Defendant walked up and asked if the victim wanted to go with him to try to pick up girls.  The victim declined.  Defendant turned to leave, but the victim asked for a ride to his brother's house.  Defendant said yes.  Defendant said his car was parked at another apartment complex, which did not strike the victim as unusual because defendant had friends there.  The victim testified that, as they walked to the car, "We got deep into the driveway, and – hmm, I took – we was [sic] walking side by side, and I noticed that I was taking a step forward, and he took a step back.  So I went to look to see, and what was the hold-up, and I got shot in the head."  The victim [later testified that he] felt the gun tap him on the back of the head.  When asked if he could tell how far away the shot was fired, the victim said, "It was right there, right behind.  It was on me.  As loud as it was, you could feel the impact.  That's what drove me forward."  The victim fell to the ground and saw an Adidas shoe – which was what defendant was wearing (along with black jeans and a white sweater).  The foot took a step, and the victim heard three more shots.

22

01  The victim was hit by three bullets – one in the head and one in
    each arm.  The bullet to the head apparently ricocheted off a
02  rounded area of the skull and ended up in the victim's neck. . . .

03  At trial, a criminalist testified the proximity of the ejected bullet
    cartridge casings . . . was consistent with the shooter being in
04  close proximity to the victim, within about a five-foot radius.
    He concluded the shots were fired from a distance greater than
05  two feet from the victim.

06  A forensic pathologist testified . . . the gunshot to the head was
    *not* fired from a range between an inch and two feet . . . [and] he
07  opined the gun was not closer than about 14 inches when the
    gunshots to the arms were fired.

08
    A tenant of an apartment adjoining the crime scene testified he
09  heard gunshots, looked outside his window, and saw a person
    running who appeared to have dark clothes.  The witness said
10  the clothes could have been "lighter than dark," but he did not
    notice a white sweater.

11
    A sheriff's detective testified the victim said it was defendant
12  who shot him.  The detective looked for but was unable to
    locate defendant or his mother, who had moved.  In December
13  2001, the sheriff's department learned defendant was in San
    Diego.  The tip came from Lauren Woods, who had become
14  friendly with defendant in San Diego and was seeking a
    restraining order against him for harassment.

15
    Lauren Woods (age 17 at the time in question) testified she met
16  defendant at a health club in the summer of 2000 and became
    friends with him, but not boyfriend-girlfriend.  He told her he
17  moved to San Diego because "he and his boys rolled on these
    fools and he caught a case."  She took that to mean he had
18  participated in something bad.  Lauren remained friends with
    defendant.  Defendant expressed a romantic interest, but she
19  was not interested.  On Christmas Eve 2001, he showed up at
    her workplace and said he wanted to marry her.  He alternated
20  between crying and yelling.  He grabbed her and pushed her.
    He said he was going to change his life and thought God was
21  blessing him.  She said if he was right with God, he should turn
    himself in.  He looked at her as if she were crazy.  She said she
22  thought he killed someone.  He said, "I didn't kill somebody.  I

01     shot somebody in the back of the head, but I didn't kill him."

02     At the time of trial, [defendant] was working at Action Wireless
and attending Sacramento State University. [Defendant
03 testified that] [h]e briefly stayed at the victim's apartment but
moved out because the victim had visitors who smoked
04 marijuana and played with guns. [He further testified that] [a]t
[a] barbecue [in April 2000], defendant did not drink alcohol or
05 smoke marijuana. He accidentally spilled the victim's beer
while trying to persuade the victim to stop drinking. The victim
06 wanted to fight, but defendant did not want to fight. [A week or
so later, the victim and defendant apologized to each other. . . .]
07 Regarding the shooting, defendant testified the victim chose the
route to defendant's car. As they were walking side-by-side
08 down the path, defendant heard a noise. As he started to look
over his shoulder, he heard a loud pop. He thought it might be a
09 gunshot, but he was unsure. He was afraid. He crouched and
ran. Although there was a fire station right there, defendant did
10 not seek help but instead got into his car and drove away,
because his car was "right there," and he was scared and "didn't
11 really know the circumstances of the fire department."[1] The
next day, defendant tried to check on the victim but did not
12 locate him. Defendant was afraid the victim was mad at being
left behind by defendant. Defendant was afraid of the victim
13 because on prior occasions the victim and his friends talked
about being gang members (Crips) from South Central Los
14 Angeles and if "one fight[s], we all fight."[2] When defendant
learned the victim was looking for him, defendant moved to San
15 Diego and stayed with his aunt. Defendant transferred colleges
and jobs. He was not trying to conceal himself from the police.
16 He did not shoot the victim.

17     When asked by the prosecutor in cross-examination, defendant
denied shooting the victim. Defendant admitted he visited the
18 apartment complex adjoining the crime scene during trial, on
the day after the tenant testified. Defendant did not recall

19

---

20     [1] A fire department paramedic heard the gunshots, ran outside, saw a figure run, get into a car,
and drive away. The paramedic did not see a white sweater. The paramedic was unable to get a
21 license plate number because the driver, who made eye contact with the paramedic, did not turn on the
car's lights until after he passed the fire station.

22     [2] The trial court gave the jury a limiting instruction not to use this evidence as truth of the
matter asserted, but only as relevant to defendant's state of mind.

REPORT AND RECOMMENDATION - 4

01                looking into the tenant's window.  Defendant admitted he asked
               the apartment manager for a map, but defendant did not recall
02                whether he told the manager he was looking for an apartment.

03                Outside the presence of the jury, defense counsel objected [that]
               the questioning was an irrelevant attempt to suggest defendant
04                was trying to harass or influence a witness who had already
               testified.  The court said the question whether defendant lied to
05                get the map went to his credibility.

06                On redirect examination, defendant testified he told the
               apartment manager *not* that he wanted to rent an apartment, but
07                that he was "interested in looking" at the apartments.
               Defendant wanted the map in order to label the walkways and
08                see if someone could have seen something.

09                In the prosecution's rebuttal case, the apartment manager who
               gave the map to defendant testified that defendant asked if there
10                were any apartments for rent.

11                Prosecution rebuttal witnesses testified that on occasions other
               than the day of the shooting, they saw defendant smoke
12                marijuana and talk about having a gun.

13 (Dkt. 16, LD 1 at 2-7.) (footnotes in original)

14        During jury deliberations, the jury asked the court reporter to read back the transcript

15 of petitioner's cross-examination several times.  (*See id.*, 2 CT at 327-29 and 331-34; *id.*, 6

16 Reporter's Transcript at 1743.)  When the reporter came out of the jury room after the jury's

17 second request to hear the testimony, "she expressed surprise [to the trial court] . . . and

18 indicated that a juror had continually asked her to keep reading because he knew somewhere

19 [petitioner] had said he shot his friend, he had shot him in the head.  And [the trial court] said

20 [to the reporter], You are kidding."  (*Id.*, 7 RT at 1901.)  After the jury announced it had

21 reached an impasse in deliberations, the trial court held a meeting outside the presence of the

22 jury in which defense counsel objected to the read back previously given to the jurors on the

REPORT AND RECOMMENDATION - 5

01   grounds that the transcript of petitioner's cross-examination was inaccurate.  (*See id.*, 2 CT at

02   332 and 335; 6 RT at 1752.)  The trial court, however, denied defense counsel's request "to

03   change the record and have anything read back to the jury."  (*Id.*, 6 RT at 1750-53.)

04         The following day the jury found petitioner guilty of attempted murder, and also found

05   true the allegations that petitioner "personally used a firearm," "intentionally and personally

06   discharged a firearm . . . thereby proximately causing great bodily injury," and "personally

07   inflicted great bodily injury" within the meaning of California Penal Code §§ 12022.5(a)(1),

08   12022.53(d), and 12022.7(a).  (*Id.*, 2 CT 343.)  The jury, however, did not find beyond a

09   reasonable doubt that petitioner committed the offense "willfully and deliberately with

10   premeditation. . . ."  (*See id.*, 2 CT 342.)

11         The trial court sentenced petitioner to nine years for the attempted murder conviction

12   and twenty-five-years-to-life for personally and intentionally discharging a firearm and

13   causing great bodily injury within the meaning of Cal. Penal Code § 12022.53(d).  (*See id.*, 2

14   CT at 418; *id.*, LD 7 at 2; *id.*, 7 RT at 1927.)  The trial court did not impose a sentence based

15   upon the other two enhancements because §12022.53(f) prohibits the court from imposing

16   those enhancements "on a person in addition to an enhancement imposed pursuant to

17   subdivision (d)."  Cal. Penal Code § 12022.53(f).  At the post-trial hearing, the trial court

18   denied defense counsel's motion to settle the record, as well as his related motion for a new

19   trial, and motion for release of jury information so the defense could call jurors as witnesses

20   to "perfect" the transcript of petitioner's cross-examination.  (*See* Dkt. 16, 7 RT at 1820-21

21   and 1862.)

22

REPORT AND RECOMMENDATION - 6

01          Petitioner, through counsel, appealed to the California Court of Appeal, which

02   affirmed his conviction and sentence in a reasoned decision.  (*See id*., LD 1 at 8, 37, 43, 47,

03   and 50.)  Petitioner then filed a petition for rehearing, which was summarily denied.  (*See id*.,

04   LD 2 and 3.)  Petitioner's petition for review in the California Supreme Court was also denied

05   without comment.  (*See id*., LD 4 and LD 5.)

06          Petitioner's first habeas corpus petition, filed in the California Court of Appeal, was

07   denied because his direct appeal was still pending before that court.  (*See id*., LD 7 at 2,

08   Exhibit N.)  After the California Court of Appeal denied petitioner's direct appeal, petitioner

09   filed a habeas petition in the Sacramento County Superior Court.  (*See id*., LD 6.)  Although

10   this petition was also initially "denied for failure to allege petitioner's custodial location and

11   the warden's identity," the Sacramento County Superior Court granted petitioner's motion for

12   reconsideration as soon as petitioner remedied these deficiencies.  (*Id*. at 9.)  The superior

13   court ultimately denied each of petitioner's claims for habeas relief on the merits.  (*See id*.,

14   LD 6 at 1-7.)  Petitioner's subsequent habeas petitions filed in the California Court of Appeal

15   and California Supreme Court were both denied without comment.  (*Id.*, LD 9; *see id*., LD 8;

16   *see* Dkt. 11 at 4.)

17          III.     FEDERAL CLAIMS FOR RELIEF

18          Petitioner now seeks federal habeas review of his conviction and sentence.  He asserts

19   that the grounds for relief alleged in his federal habeas petition were previously presented to

20   the California Supreme Court in either his direct appeal or state habeas petition.  (*See* Dkt. 1

21   at 9.)  Specifically, petitioner presents the following claims for relief:

22

(1)  Petitioner was deprived of due process under the Fifth Amendment of the federal Constitution by the prosecution's failure to disclose Carl Holmes' assaultive efforts to find out *who* had shot his cousin Martin during the previous evening; and by the prosecutor's false and misleading argument to the jury that Carl Holmes was only looking for petitioner because "it was immediately known in the entire neighborhood [petitioner] did the shooting";

(2)  Petitioner was deprived of his Sixth Amendment right to present evidence in his defense by the trial court's exclusion of a good character witness, and was deprived of the effective assistance of counsel by counsel's failure to investigate and proffer a far more extensive roster of good character witnesses as to petitioner's honesty and non-violence;

(3)  Petitioner was deprived of the effective assistance of counsel by counsel's failure to investigate and obtain petitioner's employment records for the date of the shooting;

(4)  Petitioner was deprived of the effective assistance of counsel by counsel's failure to call Carl Holmes to confirm that he and Martin were drug-dealing Crips from Southern California;

(5)  Petitioner was deprived of due process, effective assistance of counsel, and his right to confrontation by the trial court's erroneous refusal to correct an apparently incriminating court reporter error during jury deliberations, by the prosecutor's bad faith abandonment of his initial acknowledgment that petitioner had not made an admission during cross-examination, and by the ineffective assistance of defense counsel in failing to adequately defend against the court reporter error;

(6)  Petitioner was deprived of due process by the failure of the prosecution to disclose the prior criminal prosecution of prosecution witness Shawntae Smith;

(7)  [Petitioner] was deprived of due process, a fair trial, and his right to compulsory process by the trial court's exclusion of defense rebuttal witnesses, coupled with the admission of marginal impeachment evidence against [petitioner; and]

01     (8) [Petitioner] was deprived of due process and his right to
      testify by the trial court's unreasonable restrictions on his
02     testimony.

03 (*Id*. at i-iii.)

04    Respondent argues that petitioner is not entitled to relief because the state courts'

05 rejection of petitioner's claims was not contrary to or an unreasonable application of clearly

06 established federal law as determined by the U.S. Supreme Court. (*See* Dkt. 11 at 1-58.)

07 Alternatively, respondent contends that petitioner's claims are without merit. (*See id*. at 2.)

08    IV.  STANDARD OF REVIEW

09    The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

10 petition because it was filed after the enactment of AEDPA. *See Lindh v. Murphy*, 521 U.S.

11 320, 326-27 (1997). Because petitioner is in custody of the California Department of

12 Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

13 vehicle for his habeas petition. *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)

14 (providing that § 2254 is "the exclusive vehicle for a habeas petition by a state prisoner in

15 custody pursuant to a state court judgment…."). Under AEDPA, a habeas petition may not be

16 granted with respect to any claim adjudicated on the merits in state court unless petitioner

17 demonstrates that the highest state court decision rejecting his petition was either "contrary to,

18 or involved an unreasonable application of, clearly established Federal law, as determined by

19 the Supreme Court of the United States," or "was based on an unreasonable determination of

20 the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

21 § 2254(d)(1) and (2).

22

REPORT AND RECOMMENDATION - 9

01          As a threshold matter, this Court must ascertain whether relevant federal law was

02   "clearly established" at the time of the state court's decision.  To make this determination, the

03   Court may only consider the holdings, as opposed to dicta, of the U.S. Supreme Court.  *See*

04   *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  It is also appropriate to look to lower federal

05   court decisions to determine what law has been "clearly established" by the Supreme Court

06   and the reasonableness of a particular application of that law.  *See Duhaime v. Ducharme*, 200

07   F.3d 597, 598 (9th Cir. 1999).  In this context, Ninth Circuit precedent remains persuasive but

08   not binding authority.  *See Williams*, 529 U.S. at 412-13; *Clark v. Murphy*, 331 F.3d 1062,

09   1069 (9th Cir. 2003).

10          The Court must then determine whether the state court's decision was "contrary to, or

11   involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

12   *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

13   grant the writ if the state court arrives at a conclusion opposite to that reached by [the

14   Supreme] Court on a question of law or if the state court decides a case differently than [the]

15   Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

16   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

17   state court identifies the correct governing legal principle from [the] Court's decisions but

18   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

19   times, a federal habeas court must keep in mind that it "may not issue the writ simply because

20   [it] concludes in its independent judgment that the relevant state-court decision applied clearly

21   established federal law erroneously or incorrectly.  Rather that application must also be

22   [objectively] unreasonable."  *Id.* at 411.

REPORT AND RECOMMENDATION - 10

01          In each case, the petitioner has the burden of establishing that the state court decision

02  was contrary to, or involved an unreasonable application of, clearly established federal law.

03  *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

04  whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

05  state court decision because subsequent unexplained orders upholding that judgment are

06  presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

07  (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

08          When a state court reaches a decision on the merits but provides no reasoning to

09  support its conclusion, we must independently review the record to determine whether the

10  state court erred in its application of Supreme Court law.  *Delgado v. Lewis,* 223 F.3d 976,

11  982 (9th Cir. 2000).  *See also Greene v. Lambert,* 288 F.3d 1081, 1089 (9th Cir. 2002)

12  (holding that when there is an adjudication on the merits but no reason for the decision, the

13  court must review the complete record to determine whether resolution of the case constitutes

14  an unreasonable application of clearly established federal law).  Thus, while our review of the

15  record will be conducted independently in this case with regard to several of petitioner's

16  claims, we continue to show deference to the state courts' ultimate decision.  *See Pirtle v.*

17  *Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

18          Finally, AEDPA requires federal courts to give considerable deference to state court

19  decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

20  Federal courts are also bound by a state's interpretation of its own laws.  *See Murtishaw v.*

21  *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001).

22

01          V.      EXHAUSTION

02          Respondent concedes in his answer to the petition that, with the exception of

03  petitioner's claim that the prosecutor knowingly relied upon false evidence to obtain a

04  conviction when he "reversed his position" that the reporter's transcript was wrong, petitioner

05  has properly exhausted his grounds for federal habeas relief.  (*See* Dkt. 11 at 1-2.)

06  Specifically, respondent argues that petitioner first presented his false evidence claim in his

07  original petition for writ of habeas corpus filed in the California Supreme Court, which was

08  denied without comment.  (*See* Dkt. 1 at 46-50; Dkt. 11 at 4; Dkt. 16, LD 4.)  Respondent

09  asserts that petitioner's presentation of this claim "for the first and only time in a procedural

10  context in which its merits will not be considered unless there are special and important

11  reasons" did not constitute "fair presentation."  (Dkt. 11 at 47.) (citing *Castille v. Peoples*, 489

12  U.S. 346, 351 (1989) and *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994)).  As a result,

13  respondent contends that the California Supreme Court's "silent denial of the state habeas

14  petition did not suffice to exhaust Petitioner's – strictly appellate-record-based – claim that

15  the prosecutor committed misconduct and offered false evidence."  (*Id.*)

16          In fact, a review of the record before this Court reveals that several of the claims set

17  forth in petitioner's federal petition were presented for the first and only time in petitioner's

18  habeas petition filed in the California Supreme Court.  As discussed below, however,

19  respondent's argument that such claims have not been properly exhausted is unavailing.

20          It is undisputed that "on petition for review the [California] Supreme Court normally

21  will not consider an issue that the petitioner failed to timely raise in the Court of Appeal."

22  Cal. Rules of Court Rule 8.500(b) and (c).  *See also Hill v. California Board of Prison*

REPORT AND RECOMMENDATION - 12

01   *Hearings*, 2007 WL 2318976 (N.D. Cal. 2007) (holding that a petitioner's federal claim,

02   raised only in a petition for review to the California Supreme Court and denied without

03   comment, was not "fairly presented" to the state courts and was therefore unexhausted).

04   Because all California courts, including the California Supreme Court, have original habeas

05   jurisdiction, however, a petitioner may properly exhaust a claim by raising it for the first time

06   in an original petition for writ of habeas filed with the California Supreme Court, even if the

07   habeas petition is denied without comment.  *See* Cal. Const. Art. 6, § 10.  *See also Harris v.*

08   *Superior Court*, 500 F.2d 1124, 1128 (9th Cir. 1974) (holding that "[t]here is now no reason

09   to suppose that a postcard denial without opinion is indicative of anything but a decision on

10   the merits of the petition, except where a citation in the order tells us so.").

11      Thus, contrary to respondent's argument that petitioner did not "fairly present" his

12   false evidence claim to the state courts, petitioner properly exhausted this claim by presenting

13   it in his original petition for writ of habeas corpus filed with the California Supreme Court.

14   Accordingly, petitioner has properly exhausted all of the claims set forth in his federal habeas

15   petition, and this Court will consider the merits.

16      VI.    DISCUSSION

17      A.    *Claims Regarding Holmes' Efforts to Discover Who Shot the Victim*

18      Petitioner argues that he was denied due process under the Fifth Amendment to the

19   U.S. Constitution when the prosecution failed to disclose before trial the fact that the victim's

20   cousin, Carl Holmes, initiated a violent encounter with three individuals eighteen hours after

21   the victim was shot in an attempt to discover the identity of the shooter, and later pled guilty

22   to charges of assault with a deadly weapon and robbery as a result.  (*See* Dkt. 1 at 10-13.)

01   Petitioner asserts that this information was "highly material" because it "would have

02   conclusively rebutted Martin's statement to the police and his trial testimony that petitioner

03   was the perpetrator." (*Id.*)  He explains, "Obviously, if Martin had identified petitioner as the

04   perpetrator to his cousin Holmes, Holmes would have been demanding to know . . . where he

05   could find petitioner, not who the perpetrator was . . . [The victim] had ample opportunity to

06   speak to Holmes during [the] 18-hour period [when the victim was hospitalized following the

07   shooting] given that all hospital rooms have bedside phones available to the patients." (*Id.* at

08   11.)  Finally, petitioner asserts that the prosecutor's argument that Holmes went looking for

09   petitioner because "it was immediately known in the entire neighborhood [petitioner] did the

10   shooting" was clearly false and misleading. (*Id.* at 13.)

11        In *Brady v. Maryland*, the U.S. Supreme Court held that "the suppression by the

12   prosecution of evidence favorable to an accused upon request violates due process where the

13   evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith

14   of the prosecution." 373 U.S. 83, 87 (1963).  This duty to disclose evidence favorable to an

15   accused applies even when the accused has not requested such evidence, and encompasses

16   exculpatory evidence as well as evidence that could be used to impeach the government's

17   witnesses. *See United States v. Agurs,* 427 U.S. 97, 107 (1976); *United States v. Bagley,* 473

18   U.S. 667, 676 (1985).  Evidence is material "if there is a reasonable probability that, had the

19   evidence been disclosed to the defense, the result of the proceeding would have been

20   different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the

21   outcome." *Brady,* 373 U.S. at 682.  *See also Harris v. Vasquez,* 949 F.2d 1497, 1528 (9th Cir.

22   1990).  Thus, "[t]here are three components of a true *Brady* violation: [t]he evidence at issue

01   must be favorable to the accused, either because it is exculpatory, or because it is impeaching;

02   that evidence must have been suppressed by the State, either willfully or inadvertently; and

03   prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).

04        The Sacramento County Superior Court, California Court of Appeal, and the

05   California Supreme Court all rejected petitioner's *Brady* claim on habeas review.  (*See* Dkt.

06   16, LD 6, 7, 8, and 9.)  In the last reasoned state court decision to address this claim, the

07   Sacramento County Superior Court addressed petitioner's claim in detail:

08             [Petitioner] first claims that the prosecution violated *Brady v.*
               *Maryland* . . . in failing to disclose to the defense at trial that 18
09             hours after the shooting, the victim's cousin Carl Holmes had
               initiated a violent encounter with Grady Jackson, Christopher
10             Wilson, and Kyle H., during which Holmes demanded to know
               who had shot the victim.  Petitioner claims that this showed that
11             although the victim had already told police that petitioner was
               the shooter, that the victim was lying and that Holmes was
12             trying to find out who the shooter was.  Petitioner claims that
               Holmes was charged with offenses stemming from the incident,
13             in Sacramento County Superior Court Case No. 00F05148, and
               that at the preliminary hearing Christopher Wilson testified that
14             Holmes asked twice who had shot the victim, then pistol-
               whipped Jackson.  Petitioner claims that Holmes pleaded guilty
15             to the charges in May 2001, well before petitioner's trial. . . .

16             Petitioner claims that the record in the Holmes case establishes
               that the victim did not tell Holmes that petitioner was his
17             shooter but instead sent out Holmes to find out who the shooter
               was.  Petitioner claims that had he known this information at the
18             time of trial, he would have introduced it to "dramatically"
               impeach the testimony of the victim about the identity of
19             petitioner as the shooter.  In support, petitioner attaches a copy
               of the preliminary hearing transcript [in the Holmes case] in
20             which Wilson testified that on June 19, 2000, at 6:00 p.m.,
               Holmes asked Wilson twice who had shot Holmes's cousin or
21             brother, then did not give Jackson a chance to respond and
               instead pulled out his gun and pistol-whipped Jackson . . . and
22             in which an officer testified that Jackson had said that Holmes

REPORT AND RECOMMENDATION - 15

was trying to find out who had shot his brother Demonte or Delonta and that they got into an argument over that, that Holmes became really agitated because Holmes thought that Jackson knew something about who the suspect was who had shot his brother, then struck Jackson with a gun. . . .

The problem with petitioner's theory, however, is that he presents no reasonably available documentary evidence to show that Holmes had ever met up with the victim in this case, after the victim was shot but before Holmes committed his offenses against Jackson, Wilson, and Kyle H., or that the victim had ever spoken to Holmes at any time during this period.  Nor does petitioner present the content of any such conversation.  Thus, petitioner does not establish that the victim had sent out Holmes to find out who had shot the victim.   Nor does petitioner establish that Holmes had ever heard that the victim had identified petitioner as the victim's shooter; if Holmes had no knowledge of whom had shot the victim, it would make sense that Holmes sought out Jackson, Wilson, and Kyle H., to try to find out who the shooter had been.  Indeed, petitioner admits that his theory is only speculation, that the victim "must have" communicated with Holmes to direct Holmes to find out who the shooter was.   Petitioner's allegation that the victim's "communication and conspiracy with Holmes to wreak private revenge upon the perpetrators . . . require[d] disclosure" is only speculation, and is not supported by any reasonably available documentary evidence.

Further, petitioner himself testified at trial that he had learned that the victim was looking for him, which prompted him to move to San Diego.   This also belies petitioner's theory regarding Holmes.

Petitioner claims that the prosecutor added to the *Brady* error, by arguing to the jury that Holmes went out looking for petitioner the day after the shooting, once Holmes knew that petitioner was the shooter.  Petitioner claims that was false.  However, petitioner's evidence establishes only that Holmes went looking for the identity of the shooter on the day of the shooting.  By the next day, it could well be that Holmes had heard that petitioner was the shooter, and petitioner does not show otherwise.

REPORT AND RECOMMENDATION - 16

01          Petitioner fails to show that the evidence of [the Holmes case]
            was material to petitioner's [case].  No materiality being shown,
02          *Brady* was not violated and the claim is denied (*In re Bower*
            (1985) 38 Cal.3d 865).

03

04   (*Id*., LD 6 at 1-3.)

05          The record before this Court confirms that the Sacramento County Superior Court's

06   conclusion that petitioner failed to demonstrate a right to relief under *Brady* was consistent

07   with federal law.  As the superior court correctly observed, petitioner's claim is wholly based

08   upon his unsupported assumption that the victim spoke with Holmes at the hospital or by

09   telephone and asked Holmes to find out who shot him, a request which petitioner alleges

10   resulted in Holmes' offenses.  Petitioner has therefore failed to demonstrate that the

11   prosecution violated petitioner's due process rights by failing to disclose evidence of Holmes'

12   offenses and subsequent convictions, because this evidence was not "material" to his case.

13   *See Bagley,* 473 U.S. at 676.  Moreover, the superior court reasonably concluded that, even if

14   defense counsel had attempted to impeach the victim at trial with evidence of the

15   circumstances surrounding Holmes' offenses, there was no "reasonable probability" it would

16   have changed the jury's verdict.  *See Brady,* 373 U.S. at 682.

17          Petitioner has also failed to show that the prosecutor's statement during closing

18   argument that Holmes went looking for petitioner as soon as he learned petitioner was the

19   shooter because "it was immediately known in the entire neighborhood [petitioner] did the

20   shooting," even if incorrect, would have resulted in the degree of prejudice which would

21   entitle him to federal habeas relief in light of the substantial evidence of guilt adduced at

22   petitioner's trial.  (*See* Dkt. 16, 1 RT at 92-95, 118, 171-72, 203-04, 253-56; *id*., 2 RT at 555-

01   56; *id.*, 5 RT at 1482-83.)  *See also Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)

02   (providing that habeas petitioners are "entitled to relief for trial error only if they can establish

03   that 'actual prejudice' resulted.").

04        Based upon this record, the superior court reasonably concluded that petitioner has not

05   demonstrated a right to relief.  As a result, the state courts' denial of petitioner's claims was

06   not contrary to clearly established federal law or based upon an unreasonable determination of

07   the facts.

08        B.    *Character Evidence Claims*

09        1.    Sixth Amendment Claim Regarding Character Evidence

10        Petitioner contends that his Sixth Amendment right to present evidence in his defense

11   was violated by the trial court's exclusion of proffered testimony by petitioner's employer,

12   Matthew Phillips, regarding petitioner's "good character on the job."  (Dkt. 1 at 14.)

13   Specifically, petitioner asserts that he has a federal constitutional right under *Crane v.*

14   *Kentucky* to present "favorable, exculpatory evidence," which the trial court denied by

15   "excluding the proffered evidence of good character for truthfulness and veracity."  (*Id*. at

16   16.)  *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  He further argues that the California

17   Court of Appeal's denial of his claim on the basis of "an insufficient showing of prejudice"

18   was "an unreasonable application of clearly established federal law."  (Dkt. 1 at 14 and 16.)

19        Specifically, when the California Court of Appeal denied petitioner's claim on direct

20   appeal, the court stated:

21             Defendant argues he had a right to present his character
             evidence under Evidence Code section 1102 and the federal
22             Constitution, not only in response to the apartment manager's

testimony about the map, but also to support defendant's credibility generally.  Defendant cites *People v. Harris* (1989) 47 Cal.3d 1047 at page 1081, for its statement that the "truth in evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) effected a pro tanto repeal of Evidence Code section 790, footnote 9, ante. . . .

Assuming for the sake of argument that defendant has not forfeited the matter [by failing to raise his contentions regarding Evidence Code section 1102 and the federal Constitution in the trial court], and further assuming for the sake of argument that the trial court abused its discretion in excluding the testimony of defendant's employer, defendant fails to show prejudice warranting reversal of the judgment.  (Cal. Const., art. VI, § 13;[3] Evid. Code, § 354.[4])

Defendant argues he suffered "considerable prejudice," because he had a federal constitutional right to present exculpatory evidence, including evidence impeaching the prosecution's witnesses and supporting defense witnesses, including defendant himself.  Defendant fails to identify the appropriate standard of prejudice but argues the exclusion of *all* of defendant's good character evidence must be deemed prejudicial under both *Chapman v. California* (1967) 386 U.S. 18, and *People v. Watson* (1956) 46 Cal.2d 818 at page 836.  The appropriate standard is the *Watson* standard, i.e., that error is harmless if, after a full review of the record, we cannot conclude that it is reasonably probable that a verdict more favorable to defendant would have been reached in the absence of the error.  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1311-1313.)

Defendant argues this case is different from *People v. McAlpin*, supra, 53 Cal.3d 1289, which held harmless a trial court's error

---

[3]California Constitution, article VI, section 13, provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

[4] Evidence Code section 354 provides in part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice. . . ."

01        in excluding character evidence, because there some character evidence was admitted, and the probative value of the excluded

02        evidence was comparatively small.

03        Here, however, some character evidence was admitted (i.e., that defendant was gainfully employed and engaged in academic

04        studies), there was a plenitude of evidence of guilt, and there would be very little probative value to testimony that

05        defendant's employer trusted him with money.  Moreover, although defendant asserts the employer's testimony would be

06        brief, the prosecution would need to be allowed to cross-examine concerning, for example, the controls employers

07        typically have in place to prevent employee theft, which could undermine the value of the testimony that the employer trusted

08        defendant with money.  That defendant's employer testified in the first trial, which resulted in a deadlocked jury, does not

09        demonstrate prejudice in this trial.  Each trial is different.

10        Although the heading in defendant's brief says the court excluded evidence of defendant's non-violence and truthfulness,

11        defendant fails to identify any proffered but excluded evidence that he was non-violent.

12

        We conclude defendant has failed to show grounds for reversal

13        based on exclusion of good character evidence.

14  (Dkt. 16, LD 1 at 37-42.) (footnotes in original)

15       The U.S. Supreme Court has consistently held that criminal defendants have a

16  fundamental due process right, implicit in the Sixth Amendment, to present a complete

17  defense.  *See Crane*, 476 U.S. at 690 (citing *California v. Trombetta*, 467 U.S. 479, 485

18  (1984)).  This right, however, is not unlimited.  Criminal defendants do not have "an absolute

19  entitlement to introduce crucial, relevant evidence," and the introduction of relevant evidence

20  can be limited by the state for a valid reason.  *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996)

21  (citing *Crane*, 476 U.S. at 690-91).  *See also Holmes v. South Carolina*, 547 U.S. 319, 324

22  (2006).  In deciding whether the exclusion of evidence violated a defendant's due process

REPORT AND RECOMMENDATION - 20

01 right to a fair trial or Sixth Amendment right to present a defense, a federal habeas court

02 balances the following factors: (1) the probative value of the excluded evidence on the central

03 issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether

04 it is the sole evidence on the issue or is merely cumulative; and (5) whether it constitutes a

05 major part of the defense. *See Chia v. Cambra,* 360 F.3d 997, 1004-05 (9th Cir. 2004).

06     Finally, even if the trial court's exclusion of evidence amounts to a violation, habeas

07 relief may be granted only if the error had a substantial and injurious effect on the verdict.

08 *Brecht*, 507 U.S. at 637.  In other words, the error must have resulted in "actual prejudice." *Id*.

09     Here, the trial court's exclusion of the proffered testimony that petitioner's employer

10 trusted him with money did not violate petitioner's constitutional rights.  Specifically, the

11 proffered testimony about petitioner's "good character on the job" had limited probative value

12 on the central issue in the case, some positive character evidence (including evidence that

13 petitioner was currently employed at Action Wireless) had already been admitted, and

14 petitioner's "good character on the job" was not a major part of his defense.  Thus, although

15 petitioner correctly cited *Crane* as controlling case law, his reliance upon *Crane* to support his

16 argument that he had a Sixth Amendment right to present the proffered character evidence is

17 misplaced.  (*See* Dkt. 1 at 16-17.)

18     Finally, the record before this Court confirms that the California Court of Appeal's

19 finding that the trial court's exclusion of petitioner's proffered evidence did not prejudice the

20 verdict was consistent with federal law, because it did not have "a substantial and injurious

21 effect on the verdict."  (Dkt. 16, LD 1 at 42.)  *See Brecht*, 507 U.S. at 623.  Accordingly, the

22 Court recommends that petitioner's claim be denied.

01          2.      Ineffective Assistance of Counsel Claim Regarding Character Evidence

02          Petitioner contends that his "[c]ounsel's failure to adequately investigate and present

03   readily available character evidence [constituted] ineffective assistance under *Strickland v.*

04   *Washington*, 466 U.S. 668 (1984), and its progeny. . . ." (Dkt. 1 at 23.)  He claims his Sixth

05   Amendment rights were violated because "there was a gold mine of good character witnesses

06   ready and willing to testify to petitioner's good character for truthfulness and his good

07   character for non-violence, but defense counsel failed to interview them on those issues or to

08   proffer their testimony in an appropriate manner." (*Id*. at 21.)  Specifically, petitioner

09   identified six of his personal friends, family friends, or former teachers as "witnesses [who]

10   were ready and willing to testify on petitioner's behalf, as set forth in their respective

11   declarations." (*Id*. at 18-21.)  He asserts that if his defense counsel had offered this testimony,

12   "the trial court would have certainly permitted some or all of the proffered character witnesses

13   to testify," and his counsel's deficiency resulted in substantial prejudice "because the

14   prosecutor successfully introduced evidence that attacked petitioner's credibility and

15   portrayed him as a gang wannabe." (*Id*. at 22.)

16          Petitioner first presented his ineffective assistance of counsel claim in his petition for

17   writ of habeas corpus filed in the Sacramento County Superior Court.  *(See* Dkt. 16, LD 7 at

18   10-16.)  That court denied petitioner's claim on the following grounds:

19               Petitioner next claims that trial counsel rendered ineffective
                 assistance of counsel, in failing to investigate and present
20               readily available evidence of petitioner's character for both
                 honesty and non-violence.  Petitioner admits that his claim . . .
21               that the trial court had erred in excluding proffered testimony of
                 his employer regarding his good character, was raised and
22               rejected on appeal.  Nevertheless, he argues that his counsel

should have investigated and presented other witnesses who would have testified not only to honesty but also non-violence. In support, he attaches copies of declarations from potential witnesses on this subject. . . .

In rejecting the claim raised on the appeal, the Third District Court of Appeal had found that even if [it] had been error for the trial court to exclude the good character evidence [by petitioner's employer] that defense counsel did proffer, that the exclusion was not prejudicial . . . The Third District did note that petitioner, on appeal, failed to identity any proffered but excluded evidence that he was non-violent.

Thus, it appears that even if defense counsel had proffered additional evidence on petitioner's honesty, that it would not have been reasonably likely to make a difference in the outcome of the trial, as it would have been cumulative to what was already presented.   That leaves only the issue of whether defense counsel was deficient in failing to present evidence on petitioner's nonviolence.

Even if presented, however, it is not reasonably likely that the outcome of the trial would have been different.   At trial, evidence was presented that petitioner had been violent with prosecution witness Lauren Woods, in an incident at her workplace in which he grabbed her and pushed her, and that Woods had been seeking a restraining order against petitioner for harassment.   Further, the evidence in the case on the shooting itself and Woods's testimony regarding the multiple admissions that petitioner had made that he had done the shooting was strong.   And, as petitioner admits, Shawntae Smith had testified that petitioner acted as if he was and claimed to be carrying a gun prior to the shooting.   And, it appears that there was further testimony that petitioner on other occasions had talked about having a gun.   In light of this evidence of petitioner's violence and the strong evidence of petitioner being the shooter, the omission by defense counsel simply was not prejudicial.   As such, petitioner's ineffective assistance of counsel claim fails, requiring denial of the claim (Strickland v. Washington (1984) 466 U.S. 668).

(Dkt. 16, LD 6 at 3-4.)

REPORT AND RECOMMENDATION - 23

01        The Sixth Amendment guarantees a criminal defendant the right to effective assistance

02   of counsel.  *Strickland*, 466 U.S. at 687.  Claims of ineffective assistance of counsel are

03   evaluated under the two-prong test set forth in *Strickland*.  Specifically, a defendant must

04   prove (1) that counsel's performance fell below an objective standard of reasonableness, and

05   (2) that the deficient performance prejudiced the result of the proceeding.  *Id*. at 687-88 and

06   691-92.  In all cases, there is a strong presumption that counsel's performance fell within the

07   wide range of reasonably effective assistance.  *Id*. at 689.  To demonstrate prejudice, the

08   petitioner "must show that there is a reasonable probability that, but for counsel's

09   unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.

10   The U.S. Supreme Court defines "reasonable probability" as a "probability sufficient to

11   undermine confidence in the outcome."  *Id*.  The reviewing Court need not address both

12   components of the inquiry if an insufficient showing is made on one component, and there is

13   no prescribed order in which to address them.  *Id.* at 697.

14        Furthermore, ineffective assistance of counsel claims are analyzed under the

15   "unreasonable application" prong of *Williams v. Taylor*.  *See Williams*, 529 U.S. at 413.

16   When a state court has rejected an ineffective assistance of counsel claim, as it has in this

17   case, a federal habeas court's review is "doubly deferential" under AEDPA.  *Yarborough v.*

18   *Gentry*, 540 U.S. 1, 6 (2003).

19        Here, petitioner has failed to show that the Sacramento County Superior Court

20   unreasonably applied the principles set forth in *Strickland* to the facts of petitioner's case

21   when it found that petitioner failed to establish a prima facie case for relief.  Trial counsel

22   need not interview every conceivable witness to have performed proficiently.  *See Riley v.*

REPORT AND RECOMMENDATION - 24

01 *Payne*, 352 F.3d 1313, 1318 (9th Cir. 2003); *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th

02 Cir. 1995).  Specifically, a trial counsel's duty is to conduct reasonable investigations or to

03 make a reasonable decision that a particular investigation is unnecessary. *See Strickland,* 466

04 U.S. at 691 (holding that " trial counsel's defense, though unsuccessful, was the result of

05 reasonable professional judgment," where defense counsel failed to seek out character

06 witnesses other than the defendant's mother and sister and decided not to present much

07 evidence of defendant's character at trial).  A trial counsel's "particular decision not to

08 investigate must be directly assessed for reasonableness in all the circumstances, applying a

09 heavy measure of deference to counsel's judgments." *Id.* at 691.  In this case, defense counsel

10 did interview three of the six character witnesses petitioner identified, including petitioner's

11 employer and two family friends, and he later called all three of these witnesses to testify in

12 some capacity during either the guilt or sentencing phase of petitioner's trial.  There is no

13 evidence that defense counsel's failure to interview the other three individuals (a former

14 college classmate, professor, and family friend) about petitioner's character for truthfulness or

15 non-violence was objectively unreasonable under the circumstances.

16      In addition, petitioner has not demonstrated that it was objectively unreasonable for

17 his defense counsel to only offer testimony regarding petitioner's honest character from his

18 employer, Matthew Phillips.  A review of the six declarations submitted by the potential

19 character witnesses demonstrates that the other five witnesses' testimony was largely

20 cumulative of Phillips' proffered testimony.  (*See* Dkt. 16, LD 7.)  *See also Matylinsky v.*

21 *Budge*, 577 F.3d 1083, 1097 (9th Cir. 2009) (holding that a defense counsel's "choice of a

22 few select character witnesses was not unreasonable," it was unnecessary for defense counsel

01  to also offer testimony as to petitioner's "good character" from forty-one additional witnesses

02  suggested by petitioner, and that "petitioner cannot show prejudice for failure to present what

03  is most likely cumulative evidence.").

04       Finally, even assuming *arguendo* that defense counsel was objectively unreasonable

05  when he failed to ask the six friends or former teachers of petitioner to testify, consistent with

06  their declarations, that they personally believed that petitioner was an honest and non-violent

07  person, it is not reasonably probable that their testimony would have produced a different

08  outcome in light of the substantial evidence of petitioner's guilt.  (*See* Dkt. 16, 1 RT at 92-95,

09  118, 171-72, 203-04, 253-56; *id*., 2 RT at 459-531, 545-47, and 555-56; *id*., 5 RT at 1482-83.)

10  Under these circumstances, it is not reasonably probable that if additional good character

11  evidence from several of petitioner's friends and teachers had been admitted on petitioner's

12  behalf, the result of the trial would have been different.  *See Strickland*, 466 U.S. at 690.

13       Accordingly, the state court decisions' denying petitioner's ineffective assistance of

14  counsel claim did not unreasonably apply *Strickland*.  I therefore recommend that the Court

15  deny petitioner's claim.

16       C.     *Ineffective Assistance Claim Regarding Defense Counsel's Failure to Acquire
                Petitioner's Work Time Card*

17

18       Petitioner also contends that he was denied effective assistance of counsel because his

19  lawyer failed to perform an adequate investigation and obtain petitioner's employment

20  records to corroborate his testimony regarding his whereabouts on June 18, 2000, the date of

21  the shooting, which he asserts was challenged by the conflicting testimony of three

22  prosecution witnesses.  (*See* Dkt. 1 at 23-28.)  Specifically, petitioner testified that he first saw

REPORT AND RECOMMENDATION - 26

01  the victim around 10 a.m. the morning of the shooting when he stopped by the victim's

02  apartment complex "to say hi" because he "was in the area visiting some other friends" before

03  he went to work.  (Dkt. 16, 4 RT at 910.)  He testified that he worked at Red Lobster from

04  approximately 11:30 a.m. to 4:30 p.m. or 5 p.m. that day, and then saw the victim again

05  around 11 p.m. that night back at the victim's apartment.  (*Id.*, 4 RT at 910-917.)  Petitioner

06  argues that if his lawyer had obtained his work records, which show that petitioner clocked in

07  at Red Lobster at 11:30 a.m. and clocked out at 4:17 p.m., the records would have

08  corroborated his testimony, bolstered his credibility with the jury, and significantly impeached

09  the three prosecution witnesses.  (*See* Dkt. 1 at 25-26.)

10          Petitioner first presented this claim in his habeas petition to the California Supreme

11  Court, which was denied without a statement of reasons.  (Dkt. 16, LD 9 at 60-61.)  Thus, as

12  discussed above, we must independently review the record to determine whether the

13  California Supreme Court erred in its denial of petitioner's ineffective assistance of counsel

14  claim under *Strickland*.  *See Delgado,* 223 F.3d at 982; *Strickland*, 466 U.S. at 691-92.

15          At trial, the victim testified that petitioner first stopped by his apartment on the day of

16  the shooting "sometime between maybe one and four, in between there.  It was afternoon

17  time.  It wasn't evening; it wasn't morning."  (Dkt. 16, 1 RT at 88.)  Like petitioner, the

18  victim asserted that petitioner later returned to the apartment after 11:00 p.m., between

19  "[a]pproximately eleven-twenty and eleven forty-five."  (*Id.*)  Another prosecution witness,

20  Amee Wright, testified that she saw petitioner with the victim several times that day,

21  including one time she saw him hanging out on her steps with the victim "after four, around

22  four . . . Hmm, I'd been in and out during the day.  I'm not sure about the time frames

01   exactly." (*Id.*, 3 RT at 605-07 and 619.)  Similarly, prosecution witness Heather

02   Schwartzkopf testified that she saw petitioner in front of her house "earlier that evening,

03   probably around three, three or four." (*Id.*, 2 RT at 545.)  After she asked petitioner how he

04   was doing, he told her "he had a gun, and he had some problem with somebody in the south

05   area that he was going to handle."  (*Id.*, 2 RT at 547.)  At the end of their conversation,

06   petitioner told Heather he was planning to go to the Sienna Vista apartments, which she

07   assumed meant that he was going to visit the victim there.  (*See id.*)

08         Petitioner alleges that the testimony of these three witnesses suggested that "petitioner

09   was lying about his whereabouts, falsely claiming to have been working on Sunday, June 18

10   when he was actually bragging to Heather about his plan to settle a score with a gun he had

11   obtained."  (Dkt. 1 at 25.)  As a result, he contends that his counsel's failure to obtain his

12   work records to corroborate his whereabouts on the date of the shooting was objectively

13   unreasonable, because his "[d]efense counsel has a clear-cut duty to present independent and

14   objective evidence to confirm a defendant's testimony where possible . . . [and] [d]efense

15   counsel had an iron-clad source of corroboration in this case that he failed to present to

16   petitioner's great prejudice." (*Id.* at 26-27.)

17         Contrary to petitioner's contention, however, his defense counsel's failure to obtain

18   petitioner's work records to show that petitioner worked from 11:30 a.m. until 4:17 p.m. on

19   the date of the shooting was objectively reasonable.  *See Strickland*, 466 U.S. at 688.  A

20   review of the record demonstrates that the three prosecution witnesses each testified they saw

21   petitioner sometime around four o'clock on the date of the shooting.  They each qualified

22   their estimations by expressing uncertainty about the exact time they saw petitioner, however.

01 For example, Heather testified that petitioner told her about his gun and his "problem with

02 somebody in the south area that he was going to handle" sometime around "three or four" on

03 the day of the shooting.  (Dkt. 16, 2 RT at 545 and 547.)  Thus, contrary to petitioner's

04 contention, the testimony of these three witnesses' was not in direct conflict with the evidence

05 that petitioner got off work at 4:17 p.m. on the date of the shooting.  Furthermore, evidence

06 that petitioner got off work at 4:17 p.m. would not have added much value to his own

07 testimony that he worked until at least 4:30 or 5 p.m. that day.  (*Id.*, 4 RT at 910-917.)

08      In light of the fact that petitioner's work records would have had limited impeachment

09 value or value for corroborating petitioner's own testimony, it was objectively reasonable for

10 his defense counsel to decline to pursue this evidence.  *See Strickland*, 466 U.S. at 681 and

11 691.  Furthermore, petitioner has not demonstrated a reasonable probability that the admission

12 of this evidence at trial would have resulted in a different outcome.  *See id.* at 694.

13      Finally, the cases relied upon by petitioner to support his contentions are clearly

14 distinguishable because they involved counsels' failure to investigate potentially exculpatory

15 evidence.  (Dkt. 1 at 27-28.)  In this case, petitioner has never claimed that his work records

16 constitute exculpatory evidence because he admits that he was with the victim and not at work

17 at the time of the shooting.

18      As a result, I recommend the Court find that the California Supreme Court's denial of

19 petitioner's ineffective assistance of counsel claim was not an unreasonable application of

20 *Strickland.  See Williams*, 529 U.S. at 413; 28 U.S.C. § 2254(d).  Petitioner's claim should

21 therefore be denied.

22

01
          D.     *Ineffective Assistance Claim Regarding Defense Counsel's Failure to Call*
                 *Witnesses Other Than Petitioner to Prove the Victim's Gang Affiliation*

02
          Petitioner contends that his Sixth Amendment right to effective assistance of counsel

03
was also violated by his defense counsel's failure to present evidence in support of the

04
defense theory that the victim's drug-related gang activities made him vulnerable to attack by

05
rival gang members, and it was therefore possible that "someone [else] was after [the victim],

06
and [petitioner] happened to be in the wrong place at the wrong time."  (Dkt. 1 at 28.)

07
Specifically, petitioner argues that defense counsel could have proven that the victim was a

08
violent gang member by calling Carl Holmes as a witness and, if Holmes denied that he and

09
the victim were affiliated with a gang, impeaching his testimony with a record of a social

10
worker's interview with prosecution witness Amee Wright in which she expressed fear of the

11
victim and Holmes because of their alleged gang membership.  (*Id*. at 31.)

12
          Petitioner first presented his claim in his habeas petition to the California Supreme

13
Court, which was denied without statement of reasons.  (Dkt. 16, LD 9 at 22-28.)  Thus, as

14
discussed above, we independently review the record to determine whether the denial of

15
petitioner's claim was an unreasonable application of *Strickland* because (1) defense

16
counsel's performance fell below an objective standard of reasonableness, and (2) a

17
reasonable probability exists that, but for counsel's error, the result of the proceedings would

18
have been different.  *See Delgado,* 223 F.3d at 982; *Strickland*, 466 U.S. at 691-92.  Review

19
of the record before this Court confirms that petitioner has not made this showing.

20
          Contrary to petitioner's contention, defense counsel did initially attempt to present

21
evidence that the victim's gang activities made him vulnerable to attack by "unknown" rival

22

REPORT AND RECOMMENDATION - 30

01  gang members, rather than petitioner.  Specifically, during an evidentiary hearing defense

02  counsel asked the trial court to allow petitioner to testify regarding conversations petitioner

03  had with the victim and Holmes about their alleged membership in the Crips of Southern

04  California, a gang whose practice was to kill anyone who abandoned or betrayed a member of

05  the gang, during a four-day period when petitioner stayed with them.  (*See* Dkt. 16, 3 RT at

06  840.)  The trial court concluded that evidence of these conversations could be offered by

07  defense counsel in either a "pre-shooting" context, in connection with a third-party culpability

08  defense, or in a "post-shooting context," in order to explain that petitioner fled to Southern

09  California because he feared that the victim and Holmes would kill him for abandoning the

10  victim after the shooting.  (*Id*. at 842-45.)   Under the first approach, the trial court ruled that

11  defense counsel could recall the victim to the stand to question him directly about his alleged

12  gang membership, and if the victim denied being affiliated with a gang, petitioner could then

13  testify as to the victim's prior inconsistent statements.  (*Id*. at 866-67.)  Alternatively, the trial

14  court ruled that defense counsel could call petitioner to testify regarding the conversations,

15  without needing to call any other witness, as long as the jury was admonished to only consider

16  the effect these conversations might have had on petitioner's state of mind following the

17  shooting.  (*Id*. at 867-70.)  Because defense counsel decided to take the second course of

18  action, the trial court admonished the jury to only consider the statements petitioner attributed

19  to the victim in connection with petitioner's state of mind.  (*Id*. at 879-82.)  Petitioner then

20  testified and was cross-examined extensively regarding the conversations he had with the

21  victim and Holmes about their gang-related activities.  (*Id*. at 882-90; *id*., 4 RT at 938-47 and

22  1037-48.)

01    Petitioner has not demonstrated that his defense counsel's decision not call the victim,

02  Holmes, or Wright to the stand to question them on the subject of gang activity was

03  objectively unreasonable under the circumstances.  (*See id*., LD 9, Exhibit T; *id*., 3 RT at 866,

04  881-82, 889-90, 891-93.)  The trial court expressly cautioned defense counsel on several

05  occasions about the risk of "opening the door" for the prosecution to cross-examine petitioner

06  or offer other evidence on the subject of gang activity, particularly in light of the suggestive

07  evidence that had already been admitted.  (*See id*., 3 RT at 868-70.)  For example, during

08  petitioner's direct examination, the trial court stated, "if this goes too far, then I will allow the

09  DA to explore on cross how [petitioner] happened to be there [with the victim and Holmes]

10  all the time, and now suddenly he's there with guys with guns or people with guns . . . You

11  don't want to do this."  (*Id*. at 890.)  Under these circumstances, it was objectively reasonable

12  for defense counsel to ensure that any evidence of petitioner's own activities with gang

13  members would come from petitioner, rather than prosecution witnesses.

14    Finally, petitioner has failed to show that even if defense counsel had adopted a

15  different strategy, such as directly questioning the victim, Holmes, or Wright in an attempt to

16  prove the victim's gang affiliation, there was a reasonable probability that the result of the

17  proceeding would have been different.  As discussed *supra*, such questioning would have also

18  "opened the door" for additional evidence of petitioner's own activities with gang members.

19  Furthermore, petitioner has not shown that evidence regarding the victim's alleged gang

20  activities would have a reasonable probability of convincing the jury that "someone [else] was

21  after [the victim], and [petitioner] happened to be in the wrong place at the wrong time" in

22  light of the substantial evidence of petitioner's guilt.  (Dkt. 1 at 28.)

01        Accordingly, petitioner has failed to show that the California Supreme Court's denial

02    of petitioner's ineffective assistance of counsel claim was an unreasonable application of

03    *Strickland*.  I therefore recommend that the Court deny petitioner's claim.

04        E.    *Claims Regarding the Alleged Court Reporter Error*

05        Several of petitioner's claims are based upon his argument that the reporter's

06    transcript of his cross-examination inaccurately provides that petitioner answered "yes" after

07    the prosecutor's phrase "when you shot him in the back of the head," which prejudiced the

08    verdict when the transcript was read back to the jury during deliberations.  (Dkt. 1 at 36.)  In

09    addition, he claims that his constitutional rights were violated by the trial court's refusal to

10    "perfect" the record or grant a new trial during the August 29, 2003, post-trial hearing.

11    Specifically, the disputed testimony was recorded in the reporter's transcript as follows:

12        Q.  [The prosecutor]:          And so you are the only one there, but Mr. Martin, and
                                          you don't notice who is shooting, where the shots are
13                                        coming from, where you were, where Delontae was,
                                          whether they were actually shots, and you just got into
14                                        your car – ran off to your car, jumped in, and drove
                                          home, and went home to bed?

15        [Defense counsel]:             Objection, about five times.

16        THE COURT:                     Overruled.

17        [Petitioner]:                  I know where Delontae was.

18        Q. [The prosecutor]:           Where was he?

19        A.                             To my right, sir.

20        Q.                             Where was that?

21        A.                             I don't know for certain.

22

01    Q.                        So you don't know where he was, but right next to you –

02    A.                        Yes.

03    Q.                        -- when he was shot?

04    A.                        Correct.

05    Q.                        He – you were standing behind when you shot him in
06                              the back of the head –

      A.                        Yes.
07
      Q.                        -- and you fired at the heart twice, and it was a shot –
08                              and it got jammed, and you got all the bullets out of the
                                gun, and you ran out of there, and you went to San
09                              Diego, and hid for a year and a half, didn't you, sir?

10    A.                        That's not true, sir.

11    [Prosecutor]:             I have no further questions.

12    THE COURT:                Redirect.

13                              REDIRECT EXAMINATION

14    By [defense counsel]:

15    Q.                        Mr. Rezaei, when you were walking down that alleyway
                                with Mr. Delontae Martin, at some point you heard a
16                              yell; is that correct?
      A.                        That's correct.
17
      Q.                        And at some point you heard a shot, correct?
18
      A.                        That's correct, sir.
19
      Q.                        Do you have any way of knowing, as you sit here,
20                              whether or not that first shot you heard actually hit Mr.
                                Martin?
21
      A.                        I have no way of knowing.
22

REPORT AND RECOMMENDATION - 34

| 01 | Q. | How many shots did you hear that night, if you recall? |
| 02 | A. | The – including the first one, sir? |
| 03 | Q. | Yes. |
| 04 | A. | Four or five, sir. |
| 05 | Q. | Do you have any way of knowing which of those shots may have hit Delontae? |
| 06 | A. | I have no way of knowing, sir. |

07

08  (Dkt. 16, 4 RT at 1063-64.)  During the rest of the questioning and closing arguments, defense

09  counsel and the prosecution did not act as though petitioner had made an admission that he

10  "shot him in the back of the head."

11      During jury deliberations, the jury requested that the court reporter read back the

12  prosecution's cross-examination of petitioner several times.  (*See id.*, 2 CT at 327-29 and 331-

13  34; *id.*, 6 RT at 1743.)  In the words of the trial court, "As the reporter came out [of the jury

14  room after the second read back], she expressed surprise . . . and indicated that a juror had

15  continually asked her to keep reading because he knew somewhere Mr. Rezaei had said he

16  shot his friend, he had shot him in the head.  And [the trial court] said [to the reporter], You

17  are kidding."  (*Id.*, 7 RT at 1901.)  Later that afternoon, the jury informed the trial court that it

18  had reached an impasse in deliberations.  (*See id.*, 2 CT at 332 and 335.)

19      The trial court then met with counsel outside the presence of the jury, and defense

20  counsel objected to the read back previously given to the jurors by the court reporter on the

21  grounds that the transcript of petitioner's cross-examination was inaccurate, and needed to be

22

01 "perfected."[5] (*Id*. at 332; *id*., 6 RT at 1752.)  The trial court initially denied the request,

02 commenting that "I'm not going to be involved in tampering with the jury in their

03 deliberations . . . I'm not going to change the record and have anything read back to the jury."

04 (*Id*., 6 RT at 1750-53.)  When the court brought in the jury later, the chairperson reported that

05 the vote was ten to two.  The jury was told to report the next day for further deliberations.

06       On the morning of March 12, 2003, the jury requested that the court reporter read back

07 the testimony of two prosecution witnesses who both live at the apartment complex where the

08 crime was committed.  (*See id*., 2 CT at 336-37.)  At 4:20 p.m. that afternoon, the jury

09 announced it had reached its verdict.  (*See id*. at 336 and 338.)

10       The trial court later held a hearing to consider petitioner's post-trial motion to settle

11 the record, as well as his related motion for a new trial, and motion for release of jury

12 information so defense counsel could call jurors as witnesses to "perfect" the transcript of

13 petitioner's cross-examination.  (S*ee id*., 7 RT at 1820-21 and 1862.)  During the hearing,

14 both parties were given the opportunity to examine the court reporter.  (*See id*. at 1832-58.)

15 She testified that she uses keystrokes to mark sounds phonetically on her machine, and that

16 dash marks in the transcript indicate interruptions or pauses in speech patterns.  She also

17 stated that she could not be one hundred percent certain that she interjected interruptions

18 exactly where they occurred during petitioner's disputed testimony because she had no

19 _____

20       [5] The reporter's transcript of the March 11, 2003, hearing actually provides that defense counsel said, "the record needs to be 'period.'"  (*See id*., 6 RT at 1751.)  During the subsequent hearing on defense's post-trial motions, defense counsel argued that the transcript of the March 11,

21 2003, hearing was also inaccurate because the transcript should say "perfected" rather than "period." (*See id*., 7 RT at 1837.)  After the court reporter testified she uses the same keystrokes for both words, and the word "perfected" made more sense in the context, the trial court was eventually convinced that

22 this word in the transcript was indeed inaccurate.  (*See id*. at 1856-57.)

01 independent recollection of the testimony.  (*See id*. at 1843-45.)  Finally, she testified that

02 after she re-read the disputed testimony to the jury during deliberations, one juror said

03 something to the effect of, "I told you," or "See."  (*See id*. at 1843.)

04       Although the court reporter, trial court, and prosecutor each acknowledged that they

05 had no independent recollection of exactly when petitioner said "yes" in response to the

06 prosecutor's question of whether petitioner was standing behind when he shot the victim in

07 the back of the head, defense counsel made an offer of proof that he and petitioner did recall

08 exactly when petitioner answered "yes."  (*See id*. at 1859-62 and 1877.)  Specifically,

09 petitioner asserted he said the word "yes" right after the prosecutor said the word "behind."

10 (*See id*.)  Defense counsel stated that petitioner said "yes" after the word "behind" and

11 concurrent with the prosecutor's words, "when you."  (*Id*. at 1859-62.)  Although the

12 prosecutor stipulated that petitioner and defense counsel would so testify, he would not

13 stipulate that their testimony regarding the transcript was correct.  (*Id*. at 1860.)

14       At the conclusion of the hearing, the trial court denied all three motions.  (*See id*. at

15 1863, 1874, and 1893-1908.)  With respect to the motion to settle the record, the court noted

16 that "[t]here has been no testimony whatsoever other than Mr. Talesfore and [petitioner]" to

17 show that the record of petitioner's cross-examination was inaccurate.  (*Id*. at 1897.)  As a

18 result, the trial court ruled that "there is a correct understanding of the testimony, and I settled

19 the transcript by finding that the transcript as it [originally] reads is a true and [correct] copy

20 of the word spoken at the time and times in question, and the Court orders the transcript

21 remain [in its] present form."  (*Id*. at 1895.)  Moreover, the court concluded that whether "Mr.

22 Rezaei's interjection was simply an acknowledgment of a pause, such as yes, whether it was a

01  rote response, whether it was a Freudian slip or a considered and truthful answer to a

02  fragmented statement, this was a question for the jurors to be decided by the review of the

03  demeanor, the voice and [inflection], other grammatical nuances." (*Id*. at 1894 and 1901.)

04  "These are issues for the jury to consider and utilize as an exercise of the deliberating process

05  according to and within the parameters of the law as contained in the instructions." (*Id*. at

06  1895.)  Finally, the trial court found "nothing persuasive that will justify the Court in this

07  situation, in this case, to release juror information.  Or to call jurors as witnesses in this

08  hearing [because] . . . [t]he proceeding to settle the record is not – is not a juror issue." (*Id*. at

09  1863.)

10          With respect to petitioner's motion for a new trial, which was based solely upon the

11  alleged prejudice resulting from the court reporter's error, the trial court stated:

12              So what we have is, we have a direct question by [defense
                counsel] Mr. Talesfore to Rezaei [:] Did you shoot him in the
13              head?
                No.
14              [Prosecutor] Mr. Asker: Did you shoot him in the head?
                Yes.
15              What does that mean? It means there's conflict, is all it means.
                Does it mean Mr. Rezaei is more credible when he says no? Is
16              he more credible when he says yes? It's a wash, a total wash.
                And, in fact, if one were to look at the two questions and
17              compare them, it will appear that Mr. Talesfore's question is
                more credible, because it's a single question designed to elicit a
18              singular answer.  Whereas Mr. Asker's is one of many in a very
                compound protracted speech.  So the jury had both of those
19              answers in front of them.

20  (*Id*. at 1898.)  In addition, the trial court noted that following the court reporter's reading of

21  the disputed testimony to the jury, "[the jury was] hung, and they remained hung until 4

22  o'clock or so the next day."  (*Id*. at 1904.)  Thus, the court ultimately concluded that even

01  "assuming arguendo that is an error where that yes was placed – had it not been placed there,

02  had it not been read back, that, in and of itself . . . would not have made a difference in the

03  verdict reached by the jury.  Accordingly, the motion for a new trial is denied."  (*Id*. at 1899.)

04       1.  Claim that the Trial Court's Settlement of the Record Violated Petitioner's
                Rights to Due Process, Confrontation, and a Fair Trial

05

06       Petitioner contends that his federal "rights of due process, confrontation, and a fair

07  trial" were violated when the trial court "took the untenable position that whatever the court

08  reporter rendered in her machine was to remain as the official record, rather than what

09  actually happened in the courtroom during the presentation of evidence, and the jury was so

10  instructed." (Dkt. 1 at 34.)  Specifically, petitioner contends that the record of his cross-

11  examination was inaccurate because he actually answered "yes" after the phrase "you were

12  standing behind him," rather than after the phrase, "when you shot him in the back of the

13  head" as set forth in the reporter's transcript, and this error prejudiced the outcome of his trial

14  when the transcript was read back to the jury during deliberations.  (*Id*. at 36.)

15       On direct appeal, the California Court of Appeal discussed petitioner's contentions

16  regarding the alleged error in the reporter's transcript in detail, and ultimately rejected them as

17  follows:

18       Defendant argues he was deprived of constitutional rights (due
         process, the right to a jury determination, and the right to
         effective assistance of counsel) by (1) the trial court's refusal to
19       correct the transcript; (2) the inadvertent presentation of false
         incriminating evidence; (3) the jury instruction that jurors had to
20       discard their actual recollection in favor of the court reporter's
         rendition; (4) the jury's reliance on false evidence that defense
21       counsel never had an opportunity to confront or argue to the
         jury; (5) the trial court's refusal to disclose juror names and
22       addresses to defense counsel; and (6) the court's denial of

REPORT AND RECOMMENDATION - 39

01     defendant's motion for a new trial.   We shall conclude
defendant fails to show grounds for reversal.

02

          1.    *Court's Refusal to Correct Transcript*

03

04     Defendant first argues he was deprived of due process because
the court refused to correct the reporter's transcript to conform
to the evidence actually presented to the jury.   However, he fails

05     to meet his burden to show trial court error.

06     *People v. Chessman* (1950) 35 Cal.2d 455, which dealt with a
transcript prepared by another reporter after the death of the

07 court reporter, said "[T]he Rules on Appeal contemplate that no
reporter is infallible, that errors may exist in a proposed

08 transcript, that corrections may be proposed and that it shall be
the duty of the trial judge to finally determine the record." (*Id.*

09 at p. 461, citing Cal. Rules of Court, rule 12 [reviewing court
may order correction of the record or order the trial court to

10 settle disputes about errors in the record] and former rule 35,
see now rules 35.1 – 35.2 [any party may request correction of

11 the record].)   *People v. Mitchell* (1964) 61 Cal.2d 353, later
cited *Chessman* as authority for its holding that "[t]he

12 settlement of a transcript as to corrections and augmentations is
primarily a question of fact to be resolved by the trial court."

13 (*People v. Mitchell*, *supra*, 61 Cal.2d at p. 371.)
"Inconsequential inaccuracies or omissions in a record cannot

14 prejudice a party; if in truth there does exist some consequential
inaccuracy or omission, the appellant must show what it is and

15 why it is consequential." (*People v. Chessman*, *supra*, 35
Cal.2d at p. 462.)

16

17     Defendant does not address the standard of review.   Generally,
a trial court's factual findings, whether express or implied, are
reviewed under a substantial evidence standard.   (*People v.*

18 *Louis* (1986) 42 Cal.3d 969, 985.)   The People cite *Burns v.*
*Brown* (1946) 27 Cal.2d 631 at page 636, which said the trial

19 judge's decision concerning a settled statement must be
regarded as final.   However, *People v. Mitchell*, *supra*, 61

20 Cal.2d 353, said, "A reading of the transcript of the proceedings
had on defendant's application for correct and augmentation

21 clearly demonstrates that the trial court correctly decided the
matters of correction and augmentation, and no abuse of

22 discretion appears." (*Id.* at p. 371.)   We will apply a substantial

evidence standard, i.e., whether substantial evidence supports the trial court's determination that defendant failed to demonstrate a consequential inaccuracy. (*People v. Chessman*, *supra*, 35 Cal.2d 455, 462.)  We recognize defendant claims the trial court committed an error of constitutional magnitude, which might implicate a heightened standard of review were we to conclude the trial court erred.  However, we shall conclude defendant fails to show trial court error.

Many of defendant's arguments of trial court error turn on his myopic focus on the trial court's initial comment that the record could not be changed.  However, the court's initial comment is without consequence, because the court later acknowledged it had the power to correct and settle the record.

Defendant claims the trial court erred in failing to correct the record by moving defendant's "yes" to before, rather than after, the part of the prosecutor's question, "when you shot him."  We disagree.

The trial judge's familiarity with the trial and knowledge of what took place there make him uniquely qualified to determine what the evidence was and whether it had been correctly stated. (*Marks v. Superior Court* (2002) 27 Cal.4[th] 176, 196.) Although the trial judge did not specifically recall the "yes" spoken by defendant, the judge did recall the questioning and recalled initially thinking that the prosecutor was attempting to emulate "Perry Mason" with an accusatory posture designed to elicit a confession, but then concluding the prosecutor was attempting to sway the jury with a premature closing argument . . . [The trial court's statements to this effect during the trial] demonstrate[ ] that the court recollected the disputed question and answer and was capable of settling the record as it did.

Additionally, the judge's recollection undermined an assumption upon which defendant's position is premised, i.e., that the record must be wrong because if the record is accurate, then one or both attorneys would have taken the "yes" as an admission of guilt and acted accordingly. The record defeats this premise and explains how the record could be accurate without either attorneys acting upon an apparent admission of guilt, i.e., that the prosecutor may have been too focused on speech-making to hear the "yes," that defense counsel may have misheard, or that the innocuousness of the "yes" was apparent

01      from the context.  The judge also stated he had reviewed the
entire transcript and had confirmed his recollection that
02      defendant frequently interrupted or interjected before the
attorneys were finished with their questions.

03

04      The court also affirmed its confidence in the court reporter.  The
court reporter testified to her 27 years of experience as a court
reporter and the process of using keystrokes to mark
05      phonetically the sounds she hears, with dash marks used to
reflect interruptions or pauses in speech patterns.  In the
06      challenged portion of the transcript, there was no question mark
that would reflect the end of a question, but rather dash marks
07      before and after the prosecutor's words "—you were standing
behind when you shot him in the back of the head --" and dash
08      marks before the prosecutor's next words after defendant said,
"Yes."   This reflected that defendant was interrupting or
09      interjecting during a pause in the question.

10      The court reporter did not independently recall the testimony
that is the subject of this dispute, and she could not be 100
11      percent certain that she interjected interruptions exactly where
they occurred in the trial.  However, the trial court stated it had
12      confidence in her.   The judge also stated he searched the
transcript for passages he specifically remembered, and the
13      passages matched his recollections.

14      Thus, the trial court's confidence in the court reporter
constitutes further substantial evidence in support of the trial
15      court's settlement of the record.

16      Defendant claims the trial court was surprised to learn what the
transcript showed.  However, defendant overstates the matter.
17      As we read the record, the trial court expressed surprise that
anyone would interpret the testimony as admitting guilt.  Thus,
18      the trial court said: "As the [court] reporter came out [of the
jury deliberation room], she expressed surprise . . . and
19      indicated that a juror had continually asked her to keep reading
because he knew somewhere [defendant] had said he shot his
20      friend, he had shot him in the head.   And I said, You are
kidding.  And I had no specific recall of that part of the question
21      and no specific recall [of defendant] saying yes . . . But I do
recall . . . [t]hat when he did this, I absolutely remember the
22      Perry mason phenomenon coming through my mind.  I was

looking at my watch and sort of breathed in a sigh of relief when no further questions.   And the answer was totally expected, end [sic] answer that [defendant] gave: No, and I didn't do any of those things, or some way the answer was, and that was the end of it.  And it wasn't until later when the court reporter came back out and told me that and I still had no independent recollection of that portion of the question.  But I did have a recollection of those feelings of negativity."

Thus, the court's commenting, "You are kidding" to the court reporter did not necessarily express surprise that the transcript said what it said.   Rather, the court expressed surprise that anyone would interpret defendant's testimony as admitting guilt.

Defendant is incorrect in his claim that the trial court refused to consider the recollections of others.   The court accepted the stipulation that defendant and defense counsel would testify defendant said, "yes" before rather than after the part of the question about shooting the victim.   The court was not required to adopt the recollections of others.   That others had conflicting recollections does not undermine the court's decision, because substantial evidence review is limited to the determination of whether there is substantial evidence of solid value, contradicted or uncontradicted, which will support the trial court's decision.   (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *People v. Kurey* (2001) 88 Cal.App.4th 840, 848.)

Defendant complains the trial court did not consult the jurors for their recollections.   However, the court was not required to do so.  Defendant claims the trial court violated its duty to "rely upon" all available aids.  However, defendant's cited authority, *Marks v. Superior Court*, *supra*, 27 Cal.4th 176 at page 196, dealt not with correction of a transcript but with creation of settled statements, and merely said, "Once settlement is ordered, the court has broad discretion to accept or reject counsel's representations in accordance with its assessment of their credibility . . . However, it cannot refuse to make that assessment.  It may decline to settle a statement only if, after resort to all available aids, including the judge's own memory and those of the participants, it is affirmatively convinced of its inability to do so." (*Id.* at p. 194.)  Nothing in *Marks* would have required the trial court in this case to question the jurors

01        about their recollections.

02        Defendant argues his recollection must be correct, because
          otherwise the prosecutor would have made use of defendant's
03        admission in closing argument, and defense counsel would have
          "cleaned it up" in redirect examination.

04
          However, as indicated, defendant's arguments (under this and
05        all subheadings in his brief regarding the transcript) turn on his
          assumption that his utterance of the word "yes" had to mean he
06        was agreeing with the prosecutor.  Defendant fails to prove his
          point.  To the contrary, the word "yes" could merely mean
07        defendant was following the prosecutor's question, as indicated
          by the trial court.  Indeed, this latter scenario is likely, in that
08        defendant's assertion that he was saying, "yes" to being *behind*
          the victim is inconsistent with his testimony in the immediately
09        preceding question, in which defendant said he was "right next
          to" the victim when the victim was shot.  Defendant also stated,
10        earlier in his testimony, that he was "even with" the victim, not
          behind the victim, when he (defendant) heard the first pop.

11
          Defendant has failed to show the transcript is wrong, and
12        defendant fails to show any grounds for reversal of the trial
          court's determination that the meaning of defendant's "yes" was
13        a question for the jurors to decide based upon matters such as
          demeanor, voice, inflection, and other grammatical nuances. . . .

14
                    5.      *Juror Names and Addresses*
15
          Defendant next argues the trial court erred in refusing to
16        disclose the names and addresses of the jurors so that defense
          counsel could make a further evidentiary presentation regarding
17        jurors' discussions of the purported admission.  We disagree.
          Defendant fails to cite any authority whatsoever concerning the
18        disclosure of juror information.

19        Juror information is protected from disclosure, and in order to
          obtain the information, defendant had to submit "a declaration
20        that includes facts sufficient to establish good cause for the
          release of the juror's personal identifying information."  (Code
21        Civ. Proc., § 237, subd. (b)). We review the trial court's denial
          of the motion for juror information under an abuse of discretion
22        standard.  (*People v. Jones* (1998) 17 Cal.4th 279, 317.)

REPORT AND RECOMMENDATION - 44

01

02          Defendant submitted a declaration from a law student who
          spoke with four jurors after the verdict. According to the law
03          student, some jurors were influenced by the readback of
          testimony, which did not coincide with their recollection.
04          Defendant claims the declaration was admissible under the first
          sentence of Evidence Code section 1150, which provides:
05          "Upon an inquiry as to the validity of a verdict, any otherwise
          admissible evidence may be received as to statements made, or
06          conduct, conditions, or events occurring, either within or
          without the jury room, of such a character as is likely to have
07          influenced the verdict improperly." However, defendant fails to
          acknowledge the second sentence of Evidence Code section
08          1150, which provides: "No evidence is admissible to show the
          effect of such statement, conduct, condition, or event upon a
09          juror either in influencing him to assent to or dissent from the
          verdict or concerning the mental processes by which it was
10          determined." The declaration intruded on jurors' deliberative
          process in violation of the statute.

11          Defendant claims the trial court refused the defense request for
          jurors' names and addresses because the court incorrectly
12          believed such disclosure was limited to cases of juror
          misconduct. However, the court went on to say that settlement
13          of the record was not a juror issue, and the court saw nothing to
          justify recalling the jurors in order to settle the record. The
14          court said there was no requirement that each juror hear every
          word and interpret it the same way. The court said it was for
15          the jurors to interpret the evidence in their deliberative process.

16          Defendant fails to confront the point that jurors are not
          necessary to settlement of the record, because the trial judge
17          himself was a witness in the trial, as were the attorneys.
          We conclude defendant fails to show any abuse of discretion in
18          the trial court's denial of defendant's motion for release of juror
          information.

19
                        6.      *Motion for New Trial*
20
          Defendant argues the trial court erred in denying his motion for
21          a new trial. We disagree.

22

REPORT AND RECOMMENDATION - 45

01       A trial court's ruling on a defense motion for new trial is reviewed under a deferential abuse-of-discretion standard. (*People v. Navarette* (2003) 30 Cal.4th 458, 526.)

02

03       On appeal, defendant fails to cite any authority whatsoever concerning motions for new trial. . . .

04

05       Although the trial court entertained the motion for new trial despite the absence of statutory grounds, we conclude defendant has failed to show grounds for a new trial and has consequently failed to show abuse of discretion in the denial of his motion for a new trial.

06

07

08       We therefore need not address defendant's copious arguments repeating his main complaint that the transcript is wrong. Nevertheless, one point bears mention. Defendant complains the trial court, in ruling on the motion for new trial, said that insofar as the transcript showed defendant saying, "yes" to the prosecutor's question about shooting the victim, whereas defendant answered, "no" to the same question from defense counsel, it was "a wash, a total wash," and the latter answer was more credible because it responded to a direct question, whereas the prosecutor's question was a compound, protracted speech. Defendant argues the trial court's characterization of the testimony as a "wash" was "preposterous." However, this comment was appropriate in light of defendant's argument to the trial court that the jury instruction, instructing that the transcript prevailed over juror recollections, in effect directed a verdict of guilt.

09

10

11

12

13

14

15

16       We conclude defendant fails to show grounds for reversal of the judgment with respect to the reporter's transcript.

17

18  (Dkt. 16, LD 1 at 20-37.)

19       The U.S. Supreme Court has repeatedly held that federal habeas courts do not review

20  questions of state evidentiary law, and a federal habeas court must therefore defer to the state

21  courts' interpretation of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991);

22  *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Furthermore, a federal habeas court reviews a

REPORT AND RECOMMENDATION - 46

01 state appellate court's affirmation of factual findings under the standard of objective

02 reasonableness. *See Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004) (noting that a

03 reviewing federal habeas court "must be convinced that an appellate panel, applying the

04 normal standards of appellate review, could not reasonably conclude that the finding is

05 supported by the record" in order to conclude that a state court finding was unsupported by

06 substantial evidence in the state court record). Here, the California Court of Appeal examined

07 state court precedent providing that a court reporter's transcript of a trial is presumed to be

08 accurate, and that it is the duty of the trial court to settle the record as a question of fact. The

09 California Court of Appeal's subsequent determination that substantial evidence supported the

10 trial court's findings was objectively reasonable, and is entitled to deference by this Court.

11         Therefore, as to the trial court's settlement of the record, petitioner has failed to

12 establish that the decision of the California Court of Appeals was contrary to or constitutes an

13 unreasonable application of clearly established federal law as determined by the Supreme

14 Court, or that the decision was based upon an unreasonable determination of the facts in light

15 of the evidence presented to the state courts. *See* 28 U.S.C. § 2254(d). I therefore

16 recommend that petitioner's claim be denied.

17         2.      Ineffective Assistance of Counsel Claim Regarding the Alleged Reporter Error

18         Petitioner claims he was "deprived of [his Sixth Amendment right to] effective

19 assistance of counsel by [defense] counsel's failure to rebut and [defuse] the incriminating

20 impact of the purportedly incriminating admission. . . ." (Dkt. 1 at 43.) Specifically,

21 petitioner asserts that his trial "[c]ounsel could have recalled [petitioner] to testify that he had

22 not acknowledged the shooting with that interjected 'yes,' and supported this testimony by

REPORT AND RECOMMENDATION - 47

01 reference to his consistent and adamant denials of the shooting, both in the first trial and

02 throughout his testimony in the second trial."  (*Id*. at 44.)  In addition, petitioner asserts that

03 "[c]ounsel could have requested a jury instruction that the jurors were obligated to rely on

04 their own individual recollections rather than accept the rendition given by the court reporter.

05 No remedial efforts were made with respect to the jury's consideration of the surprise

06 transcript at the time it occurred." (*Id*.)

07        On direct review, the California Court of Appeal characterized this portion of

08 petitioner's ineffective assistance of counsel claim as "a repackaging of contentions we have

09 already rejected."  (Dkt. 16, LD 1 at 32.)  The state court then concluded that petitioner

10 "fail[ed] to show grounds for reversal based on his right to effective assistance of counsel."

11 (*Id*. at 33.)  We conclude that the Court of Appeal did not unreasonably apply the principles

12 set forth in *Strickland*.  *See Strickland*, 466 U.S. at 691-92.

13        At the outset, petitioner's contention that defense counsel failed to make "remedial

14 efforts . . . with respect to the jury's consideration of the surprise transcript at the time it

15 occurred" is not borne out by the record.  (Dkt. 1 at 44.)  As soon as defense counsel became

16 aware of petitioner's disputed testimony in the reporter's transcript, he immediately raised an

17 objection and asked the trial court to "perfect" the record.  (Dkt. 16, 6 RT at 1750-51.)  In

18 addition, he asked the prosecutor to "enter into a stipulation of what was actually said and

19 have that presented to the jury. . . ."  (*Id*. at 1751.)  Furthermore, during the post-trial hearing

20 on defense counsel's motion to settle the record, he repeatedly stated that he did not

21 personally believe petitioner made a statement during cross-examination the jury could have

22 interpreted as an admission of guilt at the time, because petitioner answered "yes" before the

01 prosecutor's words "shot him in the back of the head." (*See id*., 7 RT at 1859-62.)  In any

02 event, defense counsel provided petitioner with ample opportunity to reassert his innocence

03 during redirect examination, which petitioner did.  (*See* Dkt. 16, 4 RT at 1063-64.)  In light of

04 defense counsel's personal recollection of the disputed testimony and numerous efforts to

05 minimize the impact of petitioner's statement, petitioner has failed to show that his counsel's

06 performance was objectively unreasonable, and fell outside the wide range of reasonably

07 effective assistance.  *Strickland*, 466 U.S. at 689.

08        Finally, petitioner fails to provide any support for his argument that defense counsel

09 should have requested "a jury instruction that the jurors were obligated to rely on their own

10 individual recollections rather than accept the rendition given by the court reporter." (Dkt. 1 at

11 44.)  *See United States v. Evans,* 962 F.2d 15 (9th Cir. 1992) (providing that *Strickland*

12 remains the standard for evaluating the effectiveness of defense counsel who failed to seek a

13 "defense theory of the case" instruction).  Petitioner cites no authority demonstrating that the

14 jury instruction petitioner now suggests would have been "legally sound" under the

15 circumstances.  *See United States v. Lemon*, 824 F.2d 763, 764 (9th Cir. 1987).  Petitioner has

16 therefore failed to show that his counsel's failure to request the alternative jury instruction

17 now proposed by petitioner was objectively unreasonable under *Strickland*.

18        Thus, the California Court of Appeal reasonably concluded that petitioner had not

19 established any grounds for relief based upon his counsel's performance pursuant to the

20 standards set forth in *Strickland*.  Because petitioner also makes no showing in these

21 proceedings that his counsel's performance was deficient or, in any event, that any alleged

22 deficiencies prejudiced the outcome, I recommend that the Court deny his claim.

3.      Claim That The Jury Instruction Set Forth in CALJIC 1.05 Violated
        Petitioner's Right to Due Process and a Jury Trial

Petitioner contends that the jury instruction set forth in California Jury Instructions,
Criminal ("CALJIC") 1.05, which was given to the jury in his case, violated his rights to due
process and a jury trial under the Fifth, Sixth, and Fourteenth Amendments by
unconstitutionally "direct[ing] jurors to abandon their actual recollections of the trial evidence
and to adopt instead whatever version was rendered by the court reporter." (Dkt. 1 at 45.)
Specifically, he asserts that "the challenged portion of CALJIC 1.05 elevates the court
reporter to the position of ultimate arbiter of the facts, conflicts with that portion of CALJIC
that purports to assure the jurors that they are the ultimate arbiters of the facts, and
unconstitutionally infringes [upon petitioner's] right to a trial by jury." (*Id.*)

On direct review, the California Court of Appeal rejected petitioner's claim as follows:

> Defendant contends he was deprived of due process and the
> right to a jury determination by the trial court's instruction to
> the jurors to discard their own recollection of the trial in favor
> of the court reporter's rendition.  We shall conclude defendant
> fails to show instructional error.
>
> The jury instruction (based on CALJIC No. 1.05) told the jury
> as follows:
>
> "You have been given notebooks and pencils.  Leave them on
> your seat in the jury room when you leave each day and at each
> recess.  Notes are only an aid to memory and should not take
> precedence over recollection.  A juror who does not take notes
> should rely on his or her recollection of the evidence and not be
> influenced by the fact that other jurors do take notes.  Notes are
> for the note-taker's own personal use in refreshing his or her
> recollection of the evidence.  Finally, *should any discrepancy
> exist between a juror's recollection of the evidence and a
> juror's notes, and between one juror's recollection and that of
> another, you may request that the reporter read back the*

01        *relevant testimony, which must prevail.*" (Italics added.)

02        The jury instruction did not become an issue until jury
          deliberations, at which point defense counsel complained about
03        the instruction in connection with his motions to correct the
          record or obtain juror information or a new trial.

04

          On appeal, defendant claims the italicized portion of the
05        instruction was an unconstitutional invasion of his
          constitutional right to have the jurors function as the sole judges
06        of the facts.  Defendant argues the instruction distorted the
          record, usurped the jury's role, and effectively directed a verdict
07        of guilty by instructing the jury that defendant admitted the
          shooting.

08

          However, the same transcript also contained defendant's
09        denials, and therefore the instruction cannot be viewed as
          directing a verdict of guilty.  Moreover, defendant's arguments
10        illustrate that his claim of prejudicial instructional error is based
          on his contentions that (1) the transcript is wrong, and (2) the
11        instruction required the jurors to interpret "yes" in the transcript
          as an admission of guilt.  As to the latter point, defendant claims
12        that under the jury instruction "those jurors who recalled the
          evidence as consisting of [defendant] making an interjection –
13        'yes' – to simply indicate he was following [along] with the
          prosecutor's question, were *required* to yield that recollection to
14        the court reporter's rendition of the colloquy, in which
          [defendant's] interjection 'yes' carried substantive meaning as
15        an admission."
          Defendant is wrong on both points.  First, we have rejected
16        defendant's contention that the transcript is wrong.  Second, the
          instruction did not require the jurors to interpret "yes" as an
17        admission of guilt, and it did not prevent the jurors from
          interpreting the interjection as a simple indication that
18        defendant was following along with the prosecutor's question.
          Accordingly, defendant fails to show instructional error.

19

          Defendant offers no authority supporting his position that jurors
20        should be instructed to follow their own recollections rather
          than the transcript.  He cites cases, without discussion of their
21        facts, for the general proposition that judges should not make
          comments to the jury that have the effect of usurping the jury's
22        role.  He also cites case law that a tape recording entered as an

01          exhibit prevails over a transcript of the tape prepared by a
            stenographer to assist the jury.  The cited cases are inapposite.

02
            Defendant claims some jurors independently recollected there
03          was no admission by defendant during his testimony, but under
            the jury instruction, they were obligated to discard their
04          independent recollections and accept the court reporter's
            version.  However, defendant's argument is based on a hearsay
05          declaration of a law student who was asked to interview jurors
            by defense counsel.  The declaration did not present admissible
06          evidence but rather an inadmissible intrusion into the jurors'
            deliberative processes, as we discuss *post*.  In any event, the
07          juror comments reported in the declaration did not reveal that
            any juror felt coerced by CALJIC No. 1.05.  The only reference
08          to jury instructions was that one juror said that after the
            readback of defendant's testimony, the jury read "a jury
09          instruction regarding admissions" and continued to discuss the
            question and answer. We conclude defendant fails to show
10          instructional error.

11  (Dkt. 16, LD 1 at 29-32.)

12          The U.S. Supreme Court has held that federal habeas courts do not grant relief simply

13  because a jury instruction may have been deficient.  *Estelle v. McGuire,* 502 U.S. 62, 71-72

14  (1991).  Rather, the question for a federal habeas court is "whether the ailing instruction by

15  itself so infected the entire trial that the resulting conviction violates due process."  *Cupp v.*

16  *Naughten,* 414 U.S. 141, 147 (1973).  "It is well established that the instruction 'may not be

17  judged in artificial isolation,' but must be considered in the context of the instructions as a

18  whole and the trial record."  *Estelle,* 502 U.S. at 72.  In addition, in reviewing the instruction,

19  the court must inquire "whether there is a reasonable likelihood that the jury has applied the

20  challenged instruction in a way" that violates the Constitution.  *Boyde v. California*, 494 U.S.

21  370, 380 (1990).  The reviewing court must also bear in mind the Supreme Court's

22  admonition that "we have defined the category of infractions that violate 'fundamental

REPORT AND RECOMMENDATION - 52

01 fairness' very narrowly." *Estelle,* 502 U.S. at 72.

02     The record before this Court confirms that the California Court of Appeal's decision

03 was consistent with federal law, as set forth above.  Even assuming *arguendo* that the jury

04 instruction based on CALJIC No. 1.05 was deficient, petitioner has failed to demonstrate that

05 "the ailing instruction by itself so infected the entire trial that [petitioner's] resulting

06 conviction violates due process."  *Cupp*, 414 U.S. at 147.  Contrary to petitioner's

07 contentions, the jury instruction did not operate in isolation to effectively require the jury to

08 yield their own recollection of petitioner's cross-examination and interpret petitioner's answer

09 of "yes" as an admission of guilt.  For example, although the jury was instructed that the

10 reporter's transcript must prevail in the event of a discrepancy between their recollections and

11 the reporter's transcript, the jury was also instructed that they "are the exclusive judges as to

12 whether the defendant has made an admission, and if so, whether that statement is true in

13 whole or in part."  (*See* Dkt. 16, 1 CT at 92 and 106.)  Petitioner also clearly denied

14 committing the offense during direct and redirect examination, and this testimony was also

15 read back to the jury during deliberations.  (Dkt. 16, 4 RT at 926-31; *id*., 2 CT at 327-29; *id*.,

16 6 RT at 1743.)  Petitioner has therefore failed to show a reasonable likelihood that the jury

17 applied CALJIC No. 1.05 in a manner that violated his federal constitutional rights.  *See*

18 *Boyde*, 494 U.S. at 380.

19     Accordingly, petitioner fails to establish that the decision of the state courts with

20 respect to his jury instruction claim was contrary to, or constitutes an unreasonable

21 application of clearly established federal law as determined by the U.S. Supreme Court, or

22 that the decision was based upon an unreasonable determination of the facts.  I therefore

01    recommend that petitioner's claim be denied.

02        4.    Claim that the Prosecution's Presentation of False Evidence Violated
               Petitioner's Due Process Rights

03        Petitioner contends that the prosecutor "knew, believed, and was prepared to stipulate"

04    that the court reporter's transcript was wrong, but later "reversed his position" at trial.  (Dkt. 1

05    at 46 and 48.)  As a result, petitioner argues that the prosecutor knowingly relied upon false

06    evidence to obtain a conviction in violation of petitioner's rights under the Due Process

07    Clause.  (*See id*. at 50.)

08        This claim was first presented to the state courts in the petition for writ of habeas

09    corpus in the California Supreme Court, which was summarily denied.  (Dkt. 16, LD 9 at 28-

10    33.)  Accordingly, we independently review the record to determine whether the California

11    Supreme Court erred in its application of Supreme Court law.  *See Delgado,* 223 F.3d at 982.

12        The U.S. Supreme Court has long held that a criminal conviction may violate a

13    defendant's federal due process rights if it is obtained through testimony or evidence that the

14    prosecutor knows to be false, or later discovers to be false and allows to go uncorrected.  *See*

15    *Napue v. People of the State of Illinois*, 360 U.S. 264, 269-70 (1959).  *Accord Mooney v.*

16    *Holohan*, 294 U.S. 103, 112-13 (1935); *Jackson v. Brown,* 513 F.3d 1057, 1071 (9th Cir.

17    2008).  Specifically, "[d]ue process protects defendants against the knowing use of any false

18    evidence by the State, whether it be by document, testimony, or any other form of admissible

19    evidence."  *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005).  Furthermore, where a

20    prosecutor suspects that certain evidence may be false, he or she "must at least investigate."

21    *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006).  Mere inconsistencies in the evidence,

22

REPORT AND RECOMMENDATION - 54

01   however, do not constitute the knowing use of false testimony by the prosecution, and it is

02   "within the province of the jury to resolve the disputed testimony." *See United States v.*

03   *Geston,* 299 F.3d 1130, 1135 (9th Cir. 2002).  In each case, a petitioner must establish a

04   factual basis for attributing knowledge to the government that the testimony or evidence at

05   issue was false.  *See Morales v. Woodford,* 388 F.3d 1159, 1179 (9th Cir. 2004).

06        In sum, in order to prevail on a federal due process claim for habeas relief, a petitioner

07   must demonstrate that (1) the testimony or evidence was actually false; (2) the prosecution

08   knew or should have known that the testimony or evidence was actually false; and (3) the

09   false testimony or evidence was material. *See Hayes*, 399 F.3d at 984 (setting forth the

10   requirements for a petitioner to prevail under the *Mooney-Napue* line of cases).  In assessing

11   "materiality," a federal habeas court must determine whether there is "any reasonable

12   likelihood that the false testimony [or evidence] could have affected the judgment of the

13   jury," and if so, "the conviction must be set aside." *Id*.

14        Here, petitioner has failed to satisfy the first requirement under *Mooney-Napue* by

15   demonstrating that the record of his testimony during cross-examination set forth in the

16   reporter's transcript was actually false.  Although petitioner argues that he interjected the

17   word "yes" at a different time than what is recorded in the transcript, he did not provide any

18   evidence to support his claim that the trial court erred in settling the record as it did.  The trial

19   court, which "had no specific recall of that part of the question and no specific recall [of] Mr.

20   Rezaei saying yes," found that regardless of whether "Mr. Rezaei's interjection was simply an

21   acknowledgment of a pause, such as yes, whether it was a rote response, whether it was a

22   Freudian slip or a considered and truthful answer to a fragmented statement, this was a

REPORT AND RECOMMENDATION - 55

01 question for the jurors to be decided by the review of the demeanor, the voice and [inflection],

02 other grammatical nuances." (Dkt. 16, 7 RT at 1894 and 1901.) "These are issues for the jury

03 to consider and utilize as an exercise of the deliberating process according to and within the

04 parameters of the law as contained in the instructions." (*Id*. at 1895.) This Court agrees.

05 Petitioner also expressly denied shooting the victim on other occasions, and therefore his

06 testimony during cross-examination resulted in "[a]t most, two conflicting versions . . .

07 [being] presented to the jury. It [is] within the province of the jury to resolve the disputed

08 testimony." *See Geston,* 299 F.3d at 1135.

09         With respect to the second prong, and petitioner's allegation that the prosecutor knew

10 (and initially admitted) the evidence was false but nevertheless "reversed his position" to

11 obtain a conviction, the record shows that the prosecutor consistently argued throughout the

12 trial that the reporter's transcript of petitioner's cross-examination was accurate, even though

13 the defendant likely had not intended to answer the prosecutor's compound question in the

14 way that he did. For example, immediately following defense counsel's objection regarding

15 the disputed testimony on March 11, 2003, the prosecutor asserted that "it is a compound

16 question . . . [and the petitioner was] answering yes to where he was positioned, as opposed to

17 the fact that he was shot in the back of the heard. But the way it reads, black and white, it

18 looks like he answered yes." (Dkt. 16, 6 RT at 1751.) Similarly, during the post-trial hearing

19 on petitioner's motion to settle the record, the prosecutor again expressed his belief that

20 petitioner's testimony was "accurate the way it was taken down . . . I'll reiterate what I said

21 when it was first brought up. Your Honor, that's what the defendant meant to say . . . because

22 that's how it came out and that's how it read. And we believe it is correct, and there's no

01  need to perfect the record in any way." (*Id.*, 7 RT at 1874.)  He also acknowledged, "[S]till in

02  my mind, I know the defendant didn't mean to answer it that way. . . ." (*Id.* at 1884.)

03  Although the prosecutor did begin to agree to enter into some kind of stipulation with defense

04  counsel before he was interrupted mid-sentence by the trial court, there is no evidence to

05  support petitioner's argument that the prosecutor was admitting the transcript was in error.

06  (*See id.*, 6 RT at 1752; Dkt. 1 at 47.)  The prosecutor's assertions to the contrary suggest

07  otherwise.  Accordingly, petitioner has failed to establish that the prosecutor knew, or should

08  have known, that false evidence was presented to the jury.  *See Morales*, 388 F.3d at 1179.

09        Because petitioner has failed to satisfy the first and second prongs of *Mooney-Napue*,

10  the Court finds it unnecessary to address the third, materiality.  Petitioner's claim that the

11  prosecutor knowingly relied upon false evidence, in violation of his federal due process rights,

12  lacks merit.  As a result, the California Supreme Court's decision denying petitioner's due

13  process claim was objectively reasonable.  *See* 28 U.S.C. 2254(d).

14        F.      Brady *Claim Regarding Criminal History of Witness Shawntae Smith*

15        Petitioner contends that his federal due process rights were violated when the

16  prosecutor failed to disclose the fact that criminal charges had previously been filed against

17  rebuttal witness Shawntae Smith.  (*See* Dkt. 1 at 51.)  Specifically, he cites *People v. Wheeler*,

18  4 Cal.4th 284 (1992), to support his argument that "[h]ad the prosecution disclosed this

19  incident, the defense could have impeached her with it as demonstrative of moral turpitude

20  and impaired credibility." (*Id.*)  Instead, the lack of disclosure "permitted the prosecution to

21  present [Smith] to the jury with a false aura of credibility, accompanied by the unwarranted

22  and factually incorrect argument that she had 'no reason to lie.'" (*Id.*)  During petitioner's

REPORT AND RECOMMENDATION - 57

01  trial, Smith testified that she observed petitioner sitting in a room full of marijuana smoke on

02  numerous occasions, and on one occasion she observed petitioner exhibiting the handle of a

03  gun tucked into the waistband of his pants.  (*See* Dkt. 16, 5 RT at 1473-83; *id.*, 6 RT at 1501-

04  1535.)

05      As discussed *supra*, the prosecution has a duty to disclose all material evidence that is

06  favorable to the accused, including evidence that may be used to impeach the government's

07  witnesses.  *See Bagley,* 473 U.S. at 676.  "When the state decides to rely on the testimony of

08  . . . a witness, it is the state's obligation to turn over all information bearing on that witness's

09  credibility."  *Carriger v. Steward,* 132 F.3d 463, 480 (9th Cir. 1997) (citing *Giglio v. Unites

10  States,* 405 U.S. 150, 154 (1972)).  Evidence is material, and must be disclosed, "if there is a

11  reasonable probability that, had the evidence been disclosed to the defense, the result of the

12  proceeding would have been different."  *Brady,* 373 U.S. at 682.

13      Under California law, however, the trial court has "broad discretion" to admit or

14  exclude evidence of a witness' prior misconduct involving moral turpitude, including

15  misdemeanor or felony convictions, for impeachment purposes.  *See Wheeler*, 4 Cal.4th at

16  295-96; *People v. Hinton,* 37 Cal.4th 839, 887 (2006).  Furthermore, the California Supreme

17  Court has asserted that impeachment evidence involving conduct by a witness other than a

18  prior felony conviction "is a less forceful indicator of immoral character or dishonesty than is

19  a felony . . . [and] entails problems of proof, unfair surprise, and moral turpitude evaluation

20  which felony convictions do not present.  Hence, courts may and should consider with

21  particular care whether the admission of such evidence might involve undue time, confusion,

22  or prejudice which outweighs its probative value."  *Wheeler*, 4 Cal.4th at 296-97.  *See also*

01   Cal. Evid. Code § 352 (providing that the trial court may exclude evidence if its probative

02   value is substantially outweighed by the probability that its admission will necessitate undue

03   consumption of time, or create danger of undue prejudice, confusing the issues, or misleading

04   the jury).

05         Petitioner first presented his argument regarding the criminal charges filed against

06   Smith in his habeas petition to the Sacramento County Superior Court, but the superior court

07   rejected the claim based upon the following reasoning:

08             Petitioner next claims that due process was denied by the
              prosecution's failure to disclose to the defense at the time of
09             trial that prosecution's rebuttal witness Shawntae Smith herself
              had been the subject of a prior criminal prosecution, in
10             Sacramento County Superior Court Case No. 99F07081.
              Petitioner claims this violated Brady, supra.

11
              On September 1, 1999, in Case No. 99F07081, Shawntae Smith
12             was charged with assault with a knife and by means of force
              likely to produce great bodily injury (Penal Code § 245(a)(1)),
13             on her husband.  An arrest warrant was issued on October 20,
              1999, and a restraining order issued on December 15, 1999.
14             The investigating officer wrote in the crime report for the
              incident that Shawntae and her husband were involved in a
15             physical altercation in which her husband hit her, kicked her,
              and pulled her hair, then she picked up a steak knife and stabbed
16             him in the upper, inner thigh.  Preliminary hearing was set but
              then continued.  On February 9, 2000, the preliminary hearing
17             was vacated and the district attorney moved to dismiss the case
              on the ground of insufficient evidence.  Shawntae was
18             discharged and the bond exonerated.

19             The attempted murder in [petitioner's] case, the subject of the
              instant habeas petition, was not committed until several months
20             later, on June 19, 2000.  A first trial deadlocked, and the retrial
              was not had until February 2003, with Shawntae not testifying
21             in the case-in-chief but only in rebuttal, on March 5, 2003.
              It is not inferable from these circumstances that Shawntae was
22             testifying against petitioner out of any kind of deal in which she

would not be prosecuted for Case No. 99F07081 in exchange for her testimony.  By the time of the retrial, the statute of limitations had run, more than three years having passed from the time of Case No. 99F07081 being dismissed on February 9, 2000 and Shawntae's testimony on March 5, 2003 (see Penal Code § 801 [three-year statute of limitations applies to crimes the maximum punishment for which is under 8 years]).  Indeed, because it was a domestic violence case, in which the victim is often unwilling to testify, and because Shawntae probably had a viable self-defense argument to make in attempting to resist corporal punishment being attempting [sic] upon her by the victim (see Penal Code § 197; People v. Ceballos (1974) 12 Cal.3d 470 [person may use deadly force in self-defense when resisting attempt to commit felony involving violence]; see also Penal Code § 273.5(a) [felon of corporal injury on spouse]), having been physically attacked first by the victim, the district attorney's stated reason for moving for the dismissal of Case No. 99F07081 as being for insufficient evidence was clearly substantiated.  When the district attorney moved for dismissal, it would not appear that there was any intent to ever revive the charge for any reason, nor does petitioner show any.  The case was not going to result in a conviction of Shawntae, who herself appears to have been the initial victim in the matter.

And, if the matter had been disclosed to the defense in [petitioner's case], it does not appear that it would have been allowed to be introduced to impeach Shawntae.  It did not result in a conviction against Shawntae, and to prove it would have required a mini-trial that would have resulted in both an undue consumption of time and confusion to the jury as to the real issues in the case, which would have led to its exclusion under Evid. Code § 352.  And, again, the jury probably would have heard evidence that Shawntae's husband had hit her, kicked her, and pulled her hair, and that was why she reached for the knife and stabbed him, so as to get away; in these circumstances, it would not have been reasonably probable that the jury would have found Shawntae to have committed a crime of moral turpitude.

As such, the failure to disclose the prosecution against Shawntae Smith was not prejudicial, and petitioner's Brady claim on this ground also fails, requiring denial of the claim (Bower, supra).

REPORT AND RECOMMENDATION - 60

01 (Dkt. 16, LD 6 at 5-7.)

02       Here, petitioner has not demonstrated that the Sacramento County Superior Court's

03 decision denying his claim was inconsistent with federal law because there was a reasonable

04 probability that the result of petitioner's trial would have been different if the prosecution had

05 disclosed Smith's prior assault charge. *See Brady,* 373 U.S. at 682. Petitioner's conclusory

06 allegations, without more, cannot provide a basis for habeas relief. *See Jones v. Gomez*, 66

07 F.3d 199, 204-05 (9th Cir. 1995). Petitioner has failed to show that Smith's prior assault

08 charge – stemming from a physical altercation in which Smith's husband attacked her first –

09 involved "misconduct involving moral turpitude." *See Wheeler*, 4 Cal.4th at 295 (noting that

10 "the admissibility of any past misconduct for impeachment is limited at the outset by the

11 relevance requirement of moral turpitude."). Moreover, as Smith's assault charge did not

12 result in a conviction, the trial court most likely would have excluded the evidence under Cal.

13 Evidence Code § 352 because its admission would have involved undue time, confusion, or

14 prejudice. Finally, even if Smith's prior assault charge been disclosed to the defense and

15 admitted at trial, given the limited nature of Smith's testimony, the Sacramento County

16 Superior Court could reasonably conclude that there was no reasonable probability that the

17 outcome of petitioner's trial would have been different. *See Brady,* 373 U.S. at 682.

18       Accordingly, I recommend that the Court find that the Sacramento County Superior

19 Court's decision was not an unreasonable application of *Brady*, and deny petitioner's claim.

20       G.    *Claims Regarding Allegedly Arbitrary Evidentiary Rulings by the Trial Court*

21       Petitioner points to two allegedly arbitrary evidentiary rulings by the trial court to

22 support his allegation that "the trial court's exclusion of defense rebuttal witnesses, coupled

01 with the admission of marginal impeachment evidence against [petitioner]," violated his right

02 to due process and to present a defense under the Sixth and Fourteenth Amendments.  (Dkt. 1

03 at 51.)  Specifically, petitioner argues that the trial court allowed the prosecution to impeach

04 petitioner with an incident in which petitioner "may have represented himself as a prospective

05 tenant to obtain a map of the apartment complex where the shooting occurred" as well as a

06 rebuttal witness' testimony which contradicted petitioner's statement that he had never

07 smoked marijuana, without also permitting the defense to present testimony from petitioner's

08 employer regarding petitioner's character for truthfulness  (*Id*. at 52.)  Petitioner primarily

09 relies upon *Gray v. Klauser*, 282 F.3d 633 (9th Cir. 2003), to argue that the trial court's

10 application of evidentiary standards in an "arbitrary or uneven way" violated his federal

11 constitutional rights.  (*Id*.)

12        Petitioner presented this claim on direct review to the California Court of Appeal, as

13 well as in his petition for review to the California Supreme Court.  The California Court of

14 Appeal rejected petitioner's claim as follows:

15                On appeal, defendant argues, "The trial court erred in skewing
           his rulings to permit the prosecutor to engage in the
16         impeachment of [defendant's] credibility with marginal matters,
           while precluding defense counsel from rehabilitating
17         [defendant] and his credibility through the means of time-
           honored character evidence."  However, it appears the only
18         rehabilitation evidence at issue is the proffered testimony of
           defendant's employer.  Yet we see no indication that the
19         employer was prepared to testify on the question whether
           defendant lied about not smoking marijuana.  Defendant's
20         proffer was that the employer would testify defendant "runs the
           office," has been there for a year, and the employer, who was
21         aware of defendant's arrest, trusts him with money.  None of
           this proffered testimony would rehabilitate defendant.

22

01               Moreover, it is improbable, even inconceivable, that the
employer's testimony would have made a different in the

02               outcome.  Defendant argues prejudice is shown by the
prosecutor's emphasis on credibility during closing argument to

03               the jury.  However, the fact that the prosecutor attacked
defendant's credibility does not establish prejudice in the

04               exclusion of the testimony of defendant's employer.

05               Defendant cites *Gray v. Klauser* (9th Cir. 2002) 282 F.3d 633,
for the proposition that the federal constitutional guarantees of

06               due process and the right to present a defense may be violated
where evidentiary standards are applied in an arbitrary or

07               uneven way.  However, Gray was vacated by the United States
Supreme Court's grant of certiorari and remanded for further

08               consideration in light of recent authority on another ground.
(*Klauser v. Gray* (2002) 537 U.S. 1041.)  While we agree with

09               the general proposition that a trial court should not apply
evidentiary standards in an arbitrary or uneven way, defendant

10               fails to show any such defect in this case.  He argues the trial
court applied Evidence Code section 352 arbitrarily, because

11               with respect to the prosecution evidence about defendant's
deception in getting the map from the apartment manager, the

12               court said, "I've actually entertained this on my own, back there
when you objected, and I overruled it, knowing I could have

13               kept it out under [Evidence Code §] 352."  Defendant contrasts
this with the fact that, when he wanted to put on character

14               evidence, the trial court did keep the evidence out under
Evidence Code section 352.  However, in reference to the trial

15               court's statements quoted by defendant, we note the record also
shows defense counsel said he was not concerned about the

16               deception in getting the map; his concern was with the
implication that defendant was trying to intimidate a witness.

17               Defense counsel said, "And the fact that he went up to – and
said, 'I'm looking for an – an apartment and looking for a map,'

18               I don't care if he said that."

19               We conclude defendant fails to show any arbitrary or uneven
application of evidentiary standards in violation of his

20               constitutional rights.

21  (Dkt. 16, LD 1 at 43-47.)

22

REPORT AND RECOMMENDATION - 63

01          As discussed above, state and federal rulemakers have broad latitude under the U.S.

02   Constitution to establish rules excluding evidence from criminal trials, although this latitude is

03   limited by a criminal defendant's right to present a complete defense.  *See United States v.*

04   *Scheffer*, 523 U.S. 303, 308 (1998); *Crane*, 476 U.S. at 690.  A defendant's constitutional

05   rights are violated by evidence rules that "infring[e] upon a weighty interest of the accused,"

06   and are "arbitrary" or "disproportionate to the purposes they are designed to serve."  *Scheffer*,

07   523 U.S. at 308.  "While the Constitution thus prohibits the exclusion of defense evidence

08   under rules that serve no legitimate purpose or that are disproportionate to the ends that they

09   are asserted to promote, well-established rules of evidence permit trial judges to exclude

10   evidence if its probative value is outweighed by certain other factors such as unfair prejudice,

11   confusion of the issues, or potential to mislead the jury."  *Holmes*, 547 U.S. at 326.  *See also*

12   *Egelhoff*, 518 U.S. at 42 and 53.

13          To the extent petitioner is reasserting his argument that his right to present evidence in

14   his defense was violated by the trial court's exclusion of his employer's testimony under

15   California Evidence Code § 352, his claim fails.  This Court has already considered and

16   rejected petitioner's contention in Part B, *supra*.  In addition, petitioner has failed to show that

17   the trial court's admission of the prosecution's evidence about the apartment complex

18   incident, as well as testimony that contradicted petitioner's assertion that he never smoked

19   marijuana, constituted an "arbitrary" application of California Evidence Code § 352 that

20   violated his constitutional rights.  (Dkt. 1 at 52.)  *See Holmes*, 547 U.S. at 326; *Scheffer*, 523

21   U.S. at 308.

22

01       Accordingly, I recommend that the Court find that the California Court of Appeal's

02   denial of petitioner's claim was not contrary to, or an unreasonable application of, clearly

03   established federal law.  Petitioner's request for habeas relief on this claim should be denied.

04       H.   *Claims Regarding the Trial Court's Restriction of Petitioner's Testimony and*
             *Prejudice Resulting from the Cumulative Effect of Multiple Errors*

05       Petitioner's final claim is that he was denied due process and his right to testify under

06   *Rock v. Arkansas*, 483 U.S. 44 (1987), because the trial court erroneously sustained a hearsay

07   objection to his proffered testimony regarding the larger context of petitioner's conversation

08   about the shooting with Lauren Woods.  (*See* Dkt. 1 at 53-56.)  As a result, he argues that the

09   jury "heard all Lauren Woods' version, but only an [abbreviated] version of [petitioner's],

10   which explained why he would have referred to the Sacramento shooting but not as an

11   admission of guilt, but as a reference point . . . for relating to Woods' concern about her

12   father's safety as a reserve sheriff."  (*Id*. at 57.)  In other words, "[petitioner] was limited to

13   offering only his particular rendition of the statement about Sacramento . . . without context

14   from which the jury could evaluate the plausibility and credibility of [his] version."  (*Id*.)

15   Finally, he asks this Court to review the cumulative prejudice accruing from multiple errors

16   by the trial court, which he argues entitle him to habeas relief.  (*See id*. at 59.)

17       Petitioner first presented his claim in his direct appeal to the California Court of

18   Appeal, and again in his petition for review in the California Supreme Court.  The California

19   Court of Appeal ruled as follows:

20
                Defendant complains the trial court restricted his testimony
21              concerning the reason why he first told Lauren Woods about the
                shooting.
22

Defendant testified he told Lauren about the shooting when she was telling him about her father being a reserve sheriff. A hearsay objection was sustained to questions about what Lauren told defendant that caused him to mention the shooting. Defendant testified he told her, "'a friend and I were walking together, we got shot at, and he ended up – got hit . . . . I heard he got shot in the head.'"

At the next recess, defense counsel made an offer of proof that defendant would testify Lauren said she was worried for her father's safety in his work as a reserve sheriff, to which defendant responded that he knew how she felt; he was involved in a shooting in Sacramento. Defense counsel argued defendant's testimony said about what Lauren said was an exception to the hearsay rule because it was not offered for the truth, but to explain why he brought up the shooting, and it would impeach Lauren's version. The trial court excluded the evidence.

Defendant argues the context was important so the jury would understand that defendant's mention of the shooting was not an admission of guilt, but merely an acknowledgment that he had been in the proximity of a shooting and therefore understood Lauren's concern for her father's safety.

However, even assuming for the sake of argument that the trial court erred, and further assuming for the sake of argument that the error had been preserved for appeal (points disputed by the People), defendant fails to show any possible prejudice to justify reversal of the judgment. (Cal. Const., art. VI, § 13, fn. 12, *ante*; Evid. Code, § 354, fn.13, *ante*.) Defendant's appeal does not challenge Lauren's testimony about another statement he made, i.e., the admission he made to Lauren on Christmas Eve 2001 when, according to Lauren's testimony, defendant said, "'I didn't kill somebody. I shot somebody in the back of the head, but I didn't kill him.'" Under any standard of prejudice, defendant was not prejudiced by the exclusion of testimony that Lauren expressed concern for her father's safety in his work as a reserve sheriff.

Defendant cites federal case law, arguing the court's ruling violated his fundamental constitutional right to testify. However, defendant relies on a habeas corpus case where the

REPORT AND RECOMMENDATION - 66

defendant was not allowed to testify at all.  (*Gill v. Ayers* (9th Cir. 2003) 342 F.3d 911 [court erroneously refused to allow the defendant to testify at sentencing hearing to explain statements attributed to him in probation report].)  Here, defendant was allowed to testify.

We conclude defendant fails to show grounds for reversal of the judgment.

(Dkt. 16, LD 1 at 47-49.) (internal footnote omitted)

The U.S. Supreme Court has clearly held that a federal habeas court reviewing a state court judgment must assess the prejudicial impact of alleged constitutional error in a state-court criminal trial under the less onerous "substantial and injurious effect" standard set forth in *Brecht*, regardless of whether the state appellate courts recognized the error or explicitly reviewed it for harmlessness under the "harmless beyond a reasonable doubt standard" set forth in *Chapman v. California*, 386 U.S. 18, 22 (1967).  *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).  Under the *Brecht* standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that "the error had 'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)).  In other words, petitioner is "entitled to relief for trial error only if [petitioner] can establish that 'actual prejudice' resulted."  *Id.* at 621.

In the instant case, the California Court of Appeal did not explicitly recognize any error by the trial court or apply the harmlessness standard of *Chapman*.  (Dkt. 16, LD 1 at 49.) Rather, it simply concluded that "[u]nder any standard of prejudice, defendant was not prejudiced by the exclusion of testimony that Lauren [Woods] expressed concern for her

REPORT AND RECOMMENDATION - 67

01  father's safety in his work as a reserve sheriff." (*Id*.)  Accordingly, this Court reviews

02  petitioner's claim that he was denied his federal right to due process and right to testify as a

03  result of the trial court's evidentiary ruling excluding petitioner's proffered hearsay testimony

04  to determine whether the trial court's ruling, if in error, had a "substantial and injurious

05  effect" on the verdict.  *See Fry*, 551 U.S. at 121-22; *Brecht*, 507 U.S. at 637-38.

06          In addition to Woods' testimony that early in her friendship with petitioner "he told

07  [her] he and his boys rolled on these fools and he caught a case," she also testified that

08  petitioner explicitly admitted shooting someone in the back of the head to her on a separate

09  occasion.  (Dkt. 16, 2 RT at 463 and 477.)  Under these circumstances, the fact that petitioner

10  was not given an opportunity to explain that his first statement to Woods about the shooting

11  was not intended as an admission, but took place during a conversation in which Woods was

12  expressing concern about her father's safety as a reserve sheriff, did not result in "actual

13  prejudice."  *Id*. at 621.  Petitioner does not argue that he was also denied an opportunity to

14  explain the circumstances of his second admission to Woods.  (*See* Dkt. 1 at 53-58.)  Thus,

15  even assuming that petitioner's proffered hearsay testimony regarding the context of his first

16  statement was properly admissible under California Evidence Code § 356 in order "to

17  elucidate [the] part" of the conversation offered by the prosecution, the trial court's error in

18  excluding this testimony did not have a "substantial and injurious effect or influence in

19  determining the jury's verdict."  Cal. Evid. Code § 356;[6] *Brecht*, 507 U.S. at 637.

20

_____

21          [6] Specifically, this provision provides, "Where part of an act, declaration, conversation, or
    writing is given in evidence by one party, the whole on the same subject may be inquired into by an
22  adverse party . . . and when a detached act, declaration, conversation, or writing is given into evidence,
    any other act, declaration, conversation, or writing which is necessary to make it understood may also

01        Finally, petitioner has failed to show that the cumulative effect of multiple errors by

02    the trial court had "a substantial and injurious effect" on the jury's verdict. (*See* Dkt. 1 at 59.)

03    For the reasons discussed above, the Court has found no constitutional error based upon the

04    claims in his petition, let alone multiple errors.  "Because there is no single constitutional

05    error in this case, there is nothing to accumulate to a level of a constitutional violation." *See*

06    *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).  Accordingly, petitioner has not

07    demonstrated that the California Court of Appeal's decision was contrary to, or an

08    unreasonable application of, clearly established federal law.

09        VI.    CERTIFICATE OF APPEALABILITY

10        The federal rules governing habeas cases brought by state prisoners have recently been

11    amended to require a district court that denies a habeas petition to grant or deny a certificate

12    of appealability in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C.

13    § 2254 (effective December 1, 2009).

14        A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

15    dismissal of his federal habeas petition only after obtaining a certificate of appealability from

16    a district or circuit judge.  A judge shall grant a certificate of appealability only where a

17    petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28

18    U.S.C. § 2253(c)(3).  The certificate must indicate which issues satisfy this standard. *See id*.

19    § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the

20    showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that

21    reasonable jurists would find the district court's assessment of the constitutional claims

22    _____

be given in evidence."  Cal. Evid. Code § 356.

01   debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 474 (2000).

02   For the reasons set out in the discussion of the merits, above, jurists of reason would

03   not find the result debatable.  Accordingly, I recommend that the Court decline to issue a

04   certificate of appealability.  Petitioner is advised that, if this Court denies a certificate of

05   appealability, he may not appeal that denial in this Court.  Rather, he may seek a certificate

06   from the Ninth Circuit Court of Appeals under Rule 22 of the Federal Rules of Appellate

07   Procedure.

08   VII.   CONCLUSION

09   For all of these reasons, I recommend the Court find that the state courts' decisions

10   denying petitioner's claims were not contrary to, or an unreasonable application of, clearly

11   established federal law, or based on an unreasonable determination of facts.  I further

12   recommend the Court decline to issue a certificate of appealability and enter an Order

13   accepting and adopting this Report and Recommendation, denying the petition (Dkt. 1), and

14   directing that judgment be entered dismissing this action with prejudice.

15   This Report and Recommendation is submitted to the United States District Judge

16   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty (20)

17   days of being served with this Report and Recommendation, any party may file written

18   objections with this Court and serve a copy on all parties.  Such a document should be

19   captioned "Objections to Magistrate Judge's Report and Recommendation."  Either party may

20   then respond to the other party's objections within fourteen (14) days of being served a copy

21   of such written objections.  Failure to file objections within the specified time may waive the

22

01  right to appeal the District Court's order. *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

02  A proposed order accompanies this Report and Recommendation.

03      DATED this 4th day of March, 2010.

04

05

06      _____

07      JOHN L. WEINBERG
        United States Magistrate Judge

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION - 71